# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street NE**<br>**Washington, DC 20549**<br><br>                    **Plaintiff,**<br>     **v.**<br><br>**PATRICK ORLANDO,**<br>**c/o Adam L. Schwartz**<br>**Vedder Price P.C.**<br>**600 Brickell Ave., Suite 1500**<br>**Miami, FL 33131**<br><br>                    **Defendant.** | **1:24-CV-2097**<br><br>**<u>Complaint</u>**<br><br>**Jury Trial Demanded** |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Patrick Orlando, alleges as follows:

## <u>SUMMARY</u>

1.      This case involves fraudulent conduct and materially false and misleading statements and omissions made by Patrick Orlando ("Orlando"), in his capacity as the Chief Executive Officer ("CEO") and Chairman of Digital World Acquisition Corp. ("DWAC"), in filings made with the Commission. Through these publicly available filings, Orlando falsely represented that DWAC, a special purpose acquisition company ("SPAC") that he controlled, did not intend to merge with any specific company and, indeed, had had no discussions or contacts with any potential merger targets. Orlando knew these statements were false because he personally engaged in numerous lengthy discussions with representatives of Trump Media & Technology Group Corp. ("TMTG"), a social media company, and because he had targeted TMTG for merger with DWAC for months.

2.    At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC and managing member of DWAC's sponsor ("DWAC Sponsor"). In those roles, Orlando reviewed and signed the relevant filings at issue in this action.

3.    In February 2021, Orlando and others who later became involved with DWAC began extensive merger discussions with TMTG. Orlando initially pursued these discussions with TMTG on behalf of SPAC A, another SPAC he controlled.

4.    In the spring of 2021, Orlando planned and executed a scheme to use DWAC, which had not yet had its IPO, to pursue a merger with TMTG. Orlando discussed his scheme with at least one individual at TMTG.

5.    As part of this scheme, Orlando signed Forms S-1 in the spring and summer of 2021 that falsely and misleadingly stated that DWAC had not selected any merger target or engaged in any substantive discussions with any merger target. These Forms S-1 were filed with the Commission on DWAC's behalf.

6.    On September 8, 2021, DWAC completed an IPO, pursuant to which the company raised $287.5 million from the investing public. In support of its IPO, DWAC filed an amended Form S-1 with the Commission on or about August 31, 2021 (the "Final Form S-1"). Orlando signed the Final Form S-1.

7.    Among other defects, the Final Form S-1 contained material misrepresentations and omissions regarding DWAC's conduct prior to its IPO. Specifically, the Final Form S-1 falsely and misleadingly stated that: (a) neither DWAC nor its officers and directors had any discussions or contacts with any potential target companies prior to the IPO; and (b) that DWAC had not selected any specific business combination target.

8.      In October 2021, DWAC announced an agreement to merge with TMTG. Following the disclosure of the planned merger and its target, the price of DWAC stock rose over 400% in a single day of trading.

9.      As a result of Orlando's actions, DWAC's spring and summer Forms S-1 and its Final Form S-1 were materially false and misleading.

10.     On May 16, 2022, Orlando signed, and DWAC filed, a Form S-4 regarding its planned merger with TMTG that continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.

11.     On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing an $18 million civil penalty. On November 13, 2023, DWAC filed an amended Form S-4 that made disclosures consistent with the findings in the Commission's published order instituting the settled cease-and-desist proceeding.

12.     DWAC closed its merger with TMTG on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT." This Complaint will solely refer to the entity names prior to the closing of the merger.

13.     As a result of the conduct alleged herein, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14.     The Commission seeks a permanent injunction against Defendant that enjoins him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an officer and director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16.     Venue lies in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Columbia, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, Orlando signed at least four different documents containing the misrepresentations at issue, all of which were filed with the SEC, an agency headquartered in this judicial district. Additionally, records indicate that at least one investor located in Washington, D.C., sold shares of DWAC prior to the October disclosure of the merger agreement, presumably without the benefit of the information that Orlando concealed from investors and the market.

17.     Orlando, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a

national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## BACKGROUND AND TERMINOLOGY

18.     A SPAC sponsor is the management team primarily responsible for establishing and launching the SPAC. After a SPAC is launched, it is managed by a board of directors and management.

19.     A SPAC has no underlying business operations. The SPAC sponsor creates the SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an unidentified private operating company, within a specified period (typically two years).

20.     Once it has raised funds through an IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction, after which the company will continue the operations of the acquired company as a public company. Although the post-IPO SPAC is technically led by a new board of directors and management, these roles are often filled by the leaders of the SPAC's sponsor. Thus, investors in a SPAC at the IPO stage rely on the management team that formed the sponsor to expend efforts after the IPO to identify and acquire or combine with a private operating company.

21.     Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, a reasonable SPAC investor would want to know about the SPAC's future acquisition targets and steps the SPAC has taken in furtherance of a particular acquisition.

22.     Generally, in a SPAC IPO, investors purchase units. A unit is a security that is typically redeemable for one share of common stock and a fraction of a warrant. A warrant gives the holder the right to purchase a certain number of shares of the SPAC's common stock at a specific price on a future date.

23.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities (typically called "founder's shares") for nominal consideration at or around the time of the SPAC's formation. These founder's shares convert into the SPAC's common stock when the SPAC completes its acquisition of the private operating company, giving the sponsor a significant ownership interest (typically 20% of the common stock) in the SPAC – provided that the SPAC completes the business combination. Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO. Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash and are subject to forfeit in the event the SPAC fails to complete a business transaction. Moreover, the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

## DEFENDANT

24.     Patrick Orlando, age 52, is a resident of Miami, Florida. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC. He owns a significant percentage of, and at the time of the relevant conduct was the managing member of, DWAC's sponsor ("DWAC Sponsor"). Orlando also was the CEO and Chairman of SPAC A (*see infra* ¶ 2) and the managing member of SPAC A's sponsor until SPAC A was unwound in late October 2022. Orlando is also involved with several other SPACs. In addition, Orlando currently is (and, at the time of the relevant conduct, was) a registered representative of a broker-dealer registered with the Commission.

## RELATED PARTIES AND ENTITIES

25.     DWAC, a Delaware corporation based in Miami, Florida, was a SPAC. DWAC had no operations of its own and existed for the purpose of merging with a privately held company to, in effect, take that company public. On September 8, 2021, DWAC completed an

IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until completion of a business combination. DWAC had securities that traded on the NASDAQ Global Market under the ticker symbols DWACU (units), DWACW (warrants) and DWAC (common stock).

26.     TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. TMTG operates a social media platform. On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was subsequently amended several times. TMTG was initially named Trump Media Group, and accordingly, some documents refer to it as "TMG" instead of TMTG. TMTG closed its merger with DWAC on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT."

27.     DWAC Sponsor is a Delaware corporation based in Miami, Florida. DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares"). At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.

28.     SPAC A was a Delaware corporation with its principal place of business in Miami, Florida. SPAC A had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised). In October 2022, SPAC A dissolved and delisted its securities. Orlando was the CEO and Chairman of SPAC A and the managing member of the SPAC A sponsor during the relevant period.

29.     Investment Bank is an investment bank based in Shanghai, China that describes itself as a leading advisor in the SPAC market in the United States. Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

30.     <u>Individual X</u> was a DWAC Director and investor in the sponsors of both SPAC A
and DWAC. Individual X held no formal management role with respect to SPAC A.

## FACTS

**A.     Orlando's Initial Interactions With TMTG**

31.     TMTG was incorporated on approximately February 8, 2021. Its founders
intended to use the company to create a social media platform, among other business lines. From
the time of TMTG's formation, its founders intended for it to become a public company by
seeking to be acquired by a SPAC.

32.     In mid-February 2021, a representative of TMTG approached Orlando regarding a
potential deal between SPAC A and TMTG. About a week later, Orlando and Individual X met
in person with TMTG representatives.

33.     A few weeks after the initial contact, SPAC A and TMTG signed a non-exclusive
letter of intent to explore a potential merger between the two companies. The letter was then
extended to last through April 5, 2021. Orlando negotiated and signed that letter on behalf of
SPAC A.

34.     As the non-exclusive letter of intent neared its expiration date, TMTG and SPAC
A discussed signing a mutually exclusive letter of intent. Two directors and one officer of SPAC
A opposed pursuing a merger with TMTG. SPAC A ultimately did not sign that mutually
exclusive letter of intent.

35.     On or about April 8, 2021, discussions between SPAC A and TMTG paused, and
Orlando began exploring two plans to pursue a merger with TMTG, which he called "Plan A"
and "Plan B."

36.    "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG. For example, Orlando discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.

37.    "Plan B" referred to Orlando's attempt to identify an alternative SPAC to pursue a merger with TMTG. Orlando considered several SPACs with ties to Investment Bank that could be used for "Plan B." Orlando started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs. One of SPAC A's directors invested in this effort. In a communication with Orlando, both the director and Orlando referred to this as an investment in "the Trump SPAC." That SPAC A director later became a DWAC director and, in June 2021, rolled his investment into the purchase of DWAC Sponsor shares.

38.    As part of Plan B, on April 9, 2021, a representative of Investment Bank wrote an email to Orlando stating: "DWAC could be a solution for Trump." At the time, Investment Bank had a majority interest in DWAC Sponsor (which was still pre-IPO), and Orlando had no ownership interest in DWAC Sponsor or role with DWAC. Investment Bank had worked with others to incorporate DWAC Sponsor and DWAC in December 2020.

39.    On April 14, 2021, Orlando had two meetings with representatives of TMTG. During the first meeting, Orlando told the TMTG executives that SPAC A was not available to pursue a merger with TMTG because of opposition from at least one SPAC A officer or director. Orlando then suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Orlando would try to identify another vehicle to potentially pursue a merger with TMTG.

40.    Shortly after that first meeting, TMTG representatives asked Orlando to meet them again. In that second meeting, a TMTG executive said that they could only discuss other merger options after those companies were public. Orlando acknowledged that those are "the

rules we have to play by," that they "have to be very smart," but that "obviously we can talk hypothetically about if there were another vehicle."

41.     Later that day, Orlando exchanged messages with a representative of Investment Bank and wrote, "Met with TMG today." The Investment Bank representative asked, "How was it?" Orlando replied, "Was fabulous,[. . . ] wonderful then once I left all went sideways. Better to jump on the phone and discuss. . . . I had a clear strategy – got a little complicated."

42.     On April 18, 2021, four days later, a representative of Investment Bank sent a message to Orlando and wrote, "We do Trump one way or other. Now let's sign up Trump. That's the way to get the most $$$. Anyhow, we'll figure it out. Opciones hay." The last sentence of the message roughly translates to "There are options." Orlando responded, "Yes. Done this week."

43.     Also on April 18, 2021, Orlando exchanged messages with Individual X and referred to a meeting scheduled for April 20, 2021 at the offices of TMTG's outside counsel. Individual X wrote, "We will get this done!" Orlando responded, "It is done. Just need to keep the black swan out of the picture." The "black swan" was a reference to one of the SPAC A officers who opposed a deal with TMTG.

**B.     Orlando Took Control of DWAC and Resumed Merger Discussions With TMTG**

44.     On or about April 24, 2021, Investment Bank told Orlando that he had an opportunity to obtain substantial control over DWAC. A few days later, on April 28, Orlando signed a letter of intent with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor. Orlando met with TMTG's representatives on April 29 and continued discussions with TMTG about a potential merger shortly thereafter.

45.     On May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news . . . Patrick called [TMTG's outside counsel] yesterday. . . . The LOI with our other

group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with SPAC A and a big breakup fee." The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?"

46.     On May 4, 2021, TMTG's outside counsel emailed Orlando and others a draft letter of intent that contemplated a merger between SPAC A and TMTG. That draft contained a break-up fee clause that would have held Orlando and Individual X personally liable for a $5 million fee if SPAC A did not consummate a merger agreement with TMTG. Notably, however, the draft also contained an exception: the fee would not be owed if Orlando and/or Individual X "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG]."

47.     On May 8, 2021, Orlando exchanged messages with representatives of Investment Bank. The message group name, which appears to have been coined by Orlando, was, "Get it done one way or another." Orlando shared with the message group a spreadsheet that presented different merger scenarios for TMTG and another target under consideration. One of the scenarios was "47-DWAC" and "[other target]-[SPAC A]." According to Orlando, the number "47" is a reference to TMTG. The spreadsheet listed the cons for this transaction as, "Timing, can't happen, 47 too" and listed the pros as "Great $." Orlando wrote to the group, "[O]ptimal combination is clearly [SPAC A]-[other target] or another good target and DWAC-47 . . . how do we make that happen." A representative of Investment Bank responded, "Yes absolutely, that's the best. It's just time. Get enough time to get DWAC to mkt."

48.     On May 14, 2021, Investment Bank and Orlando executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Orlando.

Orlando was appointed CEO and Chairman of DWAC around this same time. These two actions gave Orlando effective control over DWAC.

49.     On the night of May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"). The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board. Both of those new DWAC directors were also SPAC A directors who had been supportive of a transaction between SPAC A and TMTG.

50.     The May Form S-1 also identified a CFO for DWAC. Before being named DWAC's CFO, that person had communicated with Orlando and Individual X about TMTG in connection with SPAC A. Records of the DWAC CFO's communications suggest that he hoped to create a Latin American version of TMTG. The SPAC A directors and officer who had opposed a transaction with TMTG did not assume any role with DWAC.

51.     The Form S-1 contained several statements about the state of discussions between DWAC and potential targets. For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

52.     The statement described in the prior paragraph was misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with TMTG, because Orlando had been in discussions with TMTG for several months, and because Orlando had discussed Plan B with representatives of TMTG. The statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with TMTG) that had already taken steps toward accomplishing that goal.

53.     Given the operation of the SEC's document filing system, the May Form S-1 became publicly visible on the morning of May 26, 2021.

54.     On May 26, 2021, an entity was incorporated in New Mexico. That entity entered into an agreement to invest in DWAC Sponsor on May 29, 2021. TMTG's external counsel signed that agreement as the "authorized representative" for the New Mexico entity. Orlando counter-signed this May 29 agreement.

55.     On May 30, 2021, Orlando, Individual X, DWAC's in-house counsel, one of the TMTG founders, and TMTG's external counsel met at Individual X's home to engage in "brainstorming sessions." A video of this event shows that, during the meeting, they called DWAC's CFO. In the video, Orlando thanked everyone for figuring out "how to get this done." The TMTG representative thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this."

56.     On May 31, 2021, an individual who helped raise funds for DWAC Sponsor sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TMG deal. It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." The potential investor responded and asked, "Is there any brochure ready for the TMG SPAC?" Orlando responded, "There is no TMG SPAC. There is a SPAC and I have a great relationship with TMG. I believe with extremely high confidence that TMG will [end] up in one of my SPACs. Better I explain in person."

## C.     The June 4 LOI and Break-Up Fee Clause

57.     By at least June 1, 2021, Orlando made plans with TMTG to sign a unilaterally exclusive letter of intent between SPAC A and TMTG on Friday, June 4, 2021. The June 4 LOI would prevent TMTG from negotiating with any other acquirers but would not require SPAC A

to be exclusive to TMTG. At that time, the SPAC A officer and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

58.     On June 1, 2021, Orlando communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the letter of intent signing event, texting: "I want Trump to meet the SPAC A AND DWAC team."

59.     On June 3, 2021, Individual X, who had hosted the May 30 meeting with TMTG, wrote to a TMTG representative and stated, "My apologies, but I will not be able to join this coming Friday. If you think it makes sense for [DWAC's CFO] and I to say a few words to the 47th, we will be ready and at his disposal." Individual X and the DWAC CFO had no formal role with SPAC A.

60.     On June 4, 2021, SPAC A, TMTG, and Orlando (in his personal capacity and on behalf of SPAC A) signed the unilaterally exclusive letter of intent (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.

61.     The June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and absolute discretion) and such terms are ultimately accepted by the Company." The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. The extensions collectively extended the trigger date for the Break-Up Fee Clause from

August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021.

62.     After the signing of the June 4 LOI, Orlando met with a representative of TMTG. During this meeting, they discussed, among other things, potential logos and names for the future public company.

**D.     Orlando Contemplated a DWAC Merger With TMTG**

63.     Within days of signing the June 4 LOI, Orlando communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG. On June 7, 2021, Orlando received a text from an individual who was a director for both SPAC A and DWAC, stating: "I still don't know why you are switching it out of [SPAC A] other than you will make more money. I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic." Orlando responded: "DWAC is better and will make the project clear [sic] more successful."

64.     As noted in the director's text message, Orlando stood to "make more money" if DWAC merged with TMTG than if SPAC A did because Orlando owned a substantial percentage of DWAC Sponsor, a position that was significantly larger than his ownership interest in SPAC A's sponsor.

65.     On June 7, 2021, Orlando exchanged messages with representatives of Investment Bank. Orlando wrote, "Let's make DWAC great. I gave [T]rump a [SPAC A] tombstone. I will [g]ive him a DWAC ONE THE SIZE OF A GOLF CART!!" In the financial industry, a "tombstone" is a notice that is used to formally announce a transaction, such as an IPO. At the LOI signing event on June 4, 2021, Orlando gave TMTG representatives a commemorative plaque tombstone related to SPAC A's IPO.

66.     On June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [SPAC A]. [sic] It's crazy but let me try!!"

67.     In yet another message regarding the other target company for SPAC A, Orlando explained to an Investment Bank executive, "[C]an't do a deal until earlier [of] aug 6 or another target switching SPACs." The Investment Bank executive asked, "Why the August 6th date? It's basically enough time to IPO DWAC, right?" Orlando replied, "Read Trump LOI." As discussed above, the June 4 LOI required Orlando to pay a $1 million Break-Up Fee if there was not a merger by August 6.

68.     On June 9, 2021, Orlando emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG at approximately $375 million.

69.     On June 11, 2021, DWAC's in-house counsel emailed Orlando and wrote, "I think the digital world logo can be a little bit more fun. Maybe we can use [TMTG representative]'s logo idea for the digital world logo and that may entice him even more to make the switch."

70.     By contrast, Orlando's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other acquisition targets.

**E.      Orlando Had Discussions With TMTG About a Merger With DWAC**

71.      In the spring and summer of 2021, Orlando met and talked with representatives of TMTG about a merger with DWAC.

72.      In addition to the April 14 conversation between Orlando and TMTG representatives in which Orlando acknowledged that he could not talk with TMTG about a merger involving a pre-IPO company, *see supra* ¶¶ 39-41, Orlando had an email exchange in late June with potential investors in DWAC Sponsor, in which he made similar disclaimers. One of those investors wrote that he had "discussed with Patrick a ROFR on future payment processing needs for the Trump Media Group." Orlando responded:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO. We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

73.      Despite having this understanding, Orlando had discussions with at least one TMTG representative about a potential merger with DWAC prior to DWAC's IPO.

74.      Orlando, DWAC's in-house counsel, and Individual X participated in more than 100 phone calls with representatives from TMTG and TMTG's outside counsel from the time DWAC filed the Form S-1 on May 25, 2021 through September 2, 2021, which was the day before the commencement of DWAC's IPO. Orlando told at least one TMTG representative (specifically, TMTG's outside counsel) during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

75.      During the same time, Orlando raised funds from numerous individuals who made investments in DWAC Sponsor. Orlando informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

76.     Orlando also signed "consulting agreements" with some individuals that, in addition to other terms, contemplated rewarding those individuals with shares for helping Orlando raise funds for DWAC Sponsor. On June 5, 2021, TMTG's outside attorney signed one such agreement on behalf of the New Mexico company that had been formed on May 26. *See supra* ¶ 54. This link between DWAC's sponsor and TMTG's outside attorney is further evidence that Orlando had discussed a DWAC/TMTG combination with highly placed individuals at TMTG in the spring and early summer of 2021.

77.     TMTG's outside counsel was copied on some emails from an existing DWAC investor to prospective investors. The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick's team, and [TMTG's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."

78.     On July 8, 2021, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Individual X and two other individuals as directors. Individual X had been involved with Orlando in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

79.     The July Form S-1 contained several of the same material misstatements that appeared in the May Form S-1. Orlando reviewed and signed the July Form S-1.

80.     Two days before this filing, Individual X sent a WhatsApp message to DWAC's CFO and wrote: "AVANTE! Vamos fazer historia com a DWAC + TMG," which roughly translates to "Onward! Let's make history with DWAC + TMG."

81.     Orlando travelled to TMTG's offices on July 8 and spent the entire day there. After Orlando left, a representative of TMTG sent a message to Orlando stating, "Today was a big day for TMG and a huge step for our team to be able to meet and spend time with you. Thank you so much for making the trip."

82.     Individuals at TMTG were aware that Orlando hoped to use DWAC to pursue a merger with TMTG. For example, on July 15, 2021, a TMTG executive emailed himself an audio recording in which he made mental notes to himself, including, "For [another TMTG executive], TMTG ticker symbol. Tell him about that. . . . The merger agreement arrived. Also potentially flipping it to another SPAC."

83.     On August 11, 2021, DWAC's CFO sent a message to Individual X and asked, "Tudo certo para semana que vem?", which roughly translates to "Everything OK for next week?" Minutes after that, Individual X sent a message to a TMTG executive and wrote, "Are we set to meet in Atlanta next week?" Individual X then called that TMTG executive and spoke for several minutes. A few hours later, Individual X replied to DWAC's CFO and wrote, "TMG pede para confirmar o encontro depois do IPO," which roughly translates to, "TMG is asking to confirm the meeting after the IPO," referring to DWAC's IPO scheduled for September.

84.     On August 18, 2021, a TMTG representative emailed himself and wrote, "Everything is lined up. Platform is weeks away. Backed by $300 million in cash. Billions of stock. Press conference video is ready. Only thing missing is license Agreement." At the time, TMTG was in the process of renegotiating a licensing agreement. Also, at the time, SPAC A had approximately $115 million in its trust account. As mentioned above, DWAC had filed a Form S-1/A on July 8, 2021 announcing that it planned to do a $300 million IPO.

85.     On August 28, 2021, Orlando received a text from a DWAC representative that read, "Talked to [TMTG's outside counsel]. TMTG wants to announce soon so if it's plan B,

they're going to push hard for relative immediate announcement. I told them we'd need a month.

Probably gonna settle at 2-3 weeks."

**F.    DWAC's Form S-1 Contained Material Misrepresentations**

86.    On August 31, 2021, three days prior to the commencement of its IPO, DWAC

filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed and signed. The

Final Form S-1 contained several material misrepresentations about discussions between DWAC

and potential targets, including the following:

> To date, our efforts have been limited to organizational activities as well as
> activities related to this offering. We have not selected any specific business
> combination target and we have not, nor has anyone on our behalf, engaged in any
> substantive discussions, directly or indirectly, with any business combination target
> with respect to an initial business combination with us.

87.    The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions,
> directly or indirectly, with any business combination target. From the period
> commencing with our formation through the date of this prospectus, there have
> been no communications or discussions between any of our officers, directors or
> our sponsor and any of their potential contacts or relationships regarding a potential
> initial business combination. Additionally, we have not engaged or retained any
> agent or other representative to identify or locate any suitable acquisition candidate,
> to conduct any research or take any measures, directly or indirectly, to locate or
> contact a target business. However, we may contact such targets subsequent to the
> closing of this offering if we become aware that such targets are interested in a
> potential initial business combination with us and such transaction would be
> attractive to our stockholders. Accordingly, there is no current basis for investors
> in this offering to evaluate the possible merits or risks of the target business with
> which we may ultimately complete our initial business combination.

88.    The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not contacted any of the prospective target businesses that [SPAC A and
> another SPAC controlled by Orlando] had considered and rejected. We do not
> currently intend to contact any of such targets; however, we may do so in the future
> if we become aware that the valuations, operations, profits or prospects of such

20

target business, or the benefits of any potential transaction with such target business, would be attractive.

89.     Certain statements in the preceding paragraphs were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with TMTG; (b) Orlando told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC to complete a merger with TMTG; (c) it appears that TMTG's outside attorney was being paid to find investors for DWAC's sponsor in June 2021; (d) the discussions between SPAC A and TMTG had ceased before DWAC's IPO; and (e) Orlando and others at DWAC had selected TMTG as DWAC's preferred target prior to its IPO.

90.     The misstatements described above were material to investors because SPAC investors base their investment decisions on a SPAC's disclosures about discussions with potential targets. This information is particularly important because the purpose of a SPAC is to identify and acquire an operating business.

91.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

92.     DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described above.

## G.     DWAC's Post-IPO Negotiations With TMTG

93.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement. On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement. TMTG's outside counsel

emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent the next day.

Two days later, on September 15, 2021, DWAC began coordinating an in-person event to sign

the letter of intent on September 22, 2021 and started discussing TMTG's hope to do a press

announcement by the end of September 2021. On September 18, 2021, TMTG's counsel emailed

a SPAC A representative a draft agreement to terminate the June 4 LOI and release Orlando from

the Break-Up Fee clause.

94.     On September 21, 2021, DWAC's Board (including Orlando) met and voted to

"follow up/negotiate and execute LOIs with TMG" and two other purported potential targets

(one of which was "Target B"). As mentioned above, DWAC in-house counsel, working with

Orlando, was already in the process of negotiating a letter of intent with TMTG and had already

scheduled a signing event, a fact that Orlando knew.

95.     DWAC representatives had previously sent Target B an NDA on September 8,

2021. A representative of Target B responded on September 9 and wrote: "Given [Target B's]

transaction objectives and timing of requested indications of interest next week, it may make

sense for our team to reach out to you with any future opportunities that arise rather than this

particular target." DWAC later disclosed this fact in its Form S-4 filed February 14, 2024, which

stated:

> DWAC sent an NDA to Target B, an American pet care company that offers a
> technology platform to enable on-demand and scheduled dog-walking, training,
> and other pet care related services. However, Target B informed Digital World
> that it was in advanced discussions with other groups and did not want to pursue
> separate SPAC discussions with Digital World at that time.

96.     The discussions about Target B at the September 21 board meeting appear to have

been pretextual because Target B was not, in fact, an acquisition option for DWAC.

97.     During the September 21 board meeting, DWAC's directors also purportedly

discussed the merits of four other potential merger targets. One of those targets was "Target G."

DWAC sent Target G an NDA on September 8, 2021. A representative of Target G responded on September 9: "We're currently under exclusivity with a potential buyer for [Target G]. We'll reach out if the situation changes." In its February 14, 2024 Form S-4, DWAC disclosed: "Target G, a defense contractor and arms manufacturer, was sent an NDA; however, Digital World was informed that Target G was under exclusivity with another SPAC at the time and could not engage in conversations until after that exclusivity period expired."

98.     The discussions about Target G at the September 21 board meeting appear to have been pretextual because Target G was not, in fact, an acquisition option for DWAC.

99.     A third potential "target" discussed at the September 21 board meeting was "Target I." Target I did not even sign an NDA with DWAC until the evening of September 21.

100.    On September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with TMTG. That same day, Orlando met with representatives from TMTG and signed a mutually exclusive letter of intent between DWAC and TMTG. Also on that same day, Orlando (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause under the June 4 LOI. That letter was backdated to be effective as of September 1, 2021.

101.    On October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with TMTG. DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market close that day. DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on EDGAR at approximately 6 a.m. on October 21, 2021.

102.    DWAC's common stock closed at $9.96 on October 20, 2021. On October 21, 2021, it closed at $45.50, up more than 400% from the prior day's closing price.

103.    On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG. DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts. For example, DWAC's Form S-4:

    a.   Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.

    b.   Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. As discussed above in detail, Orlando had numerous interactions with TMTG prior to DWAC's IPO. DWAC also did not disclose that Orlando assumed control of DWAC in spring 2021 envisioning it as a potential vehicle to close a deal with TMTG or that Orlando told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

104.    On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing a civil penalty of $18 million. The settlement also imposed an undertaking on DWAC, requiring any amended Form S-4 to be materially complete, accurate, and consistent with the findings in the Commission's order. On November 23, 2023, pursuant to the undertaking, DWAC filed an amended Form S-4 incorporating many of the Commission's findings.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder**

105.     The Commission realleges and incorporates by reference paragraphs 1 through

104, as though fully set forth herein.

106.     By engaging in the conduct described above, Patrick Orlando, in connection with

the purchase or sale of securities, by the use of means or instrumentalities of interstate

commerce, or of the mails, or of the facilities of a national securities exchange, directly or

indirectly, knowingly or recklessly (a) used or employed devices, schemes, or artifices to

defraud; (b) made untrue statements of material fact or omitted to state material facts necessary

in order to make the statements made, in the light of the circumstances under which they were

made, not misleading; and (c) engaged in acts, practices, or courses of business which operated

or would operate as a fraud or deceit upon other persons.

107.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow

him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of

merging with TMTG. That conduct included, but was not limited to, the following: (1) he

discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then

entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC

A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to

bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who

possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG;

and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary

conversations with potential "target" companies in September 2021 without any intention of

moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed

multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

25

selected a merger target and had not engaged in discussions with potential targets. Orlando

carried out this deceptive course of business as part of a scheme to allow him to reap the

financial benefit of the DWAC merger and avoid opposition from the SPAC A directors.

Orlando's scheme continued through the spring of 2022, when he continued to mislead investors

through false statements and omissions in the Form S-4, which he signed.

108.    While engaging in the conduct described above, Orlando acted knowingly or

recklessly.

109.    By reason of the conduct described above, Orlando, directly or indirectly, violated

and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>SECOND CLAIM FOR RELIEF</u>
**Violations of Section 17(a) of the Securities Act**

110.    The Commission realleges and incorporates by reference paragraphs 1 through

104, as though fully set forth herein.

111.    By engaging in the conduct described above, Orlando, directly or indirectly, in

connection with the offer or sale of securities, by the use of means or instrumentalities of

interstate commerce, or of the mails, directly or indirectly: (i) employed devices, schemes, or

artifices to defraud; (ii) obtained money or property by means of any untrue statement of

material fact or any omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and/or (iii)

engaged in transactions, practices, or courses of business that operated or would operate as a

fraud or deceit upon the purchaser.

112.    In the spring of 2021, Orlando engaged in deceptive conduct that would allow

him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of

merging with TMTG. That conduct included, but was not limited to, the following: (1) he

discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then

entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC

A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to

bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who

possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG;

and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary

conversations with potential "target" companies in September 2021 without any intention of

moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed

multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

selected a merger target and had not engaged in discussions with potential targets. Orlando

carried out this deceptive course of business as part of a scheme to allow him to reap the

financial benefit of the DWAC merger and avoid opposition from the SPAC A directors.

Orlando's scheme continued through the spring of 2022, when he continued to mislead investors

through false statements and omissions in the Form S-4, which he signed.

113.     While engaging in the conduct described above, Orlando acted knowingly,

recklessly, or negligently.

114.     By reason of the conduct described above, Orlando, directly or indirectly, violated

and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following

relief:

**I.**

Enter a Final Judgment permanently restraining and enjoining Defendant and his agents,

servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter a Final Judgment directing Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)].

## III.

Enter a Final Judgment directing Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)].

## IV.

Enter a Final Judgment permanently barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Grant such other and further relief as this Court may deem equitable and just.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


Dated: July 17, 2024                    Respectfully submitted,

                                        By: */s/ John B. Timmer*
                                        John B. Timmer (D.C. Bar No. 997309)
                                        Andrew McFall (D.C. Bar No. 497878)
                                        Securities and Exchange Commission
                                        100 F Street NE
                                        Washington, DC 20549
                                        (202) 551-7687 (Timmer)
                                        (202) 551-5538 (McFall)
                                        Email: TimmerJ@SEC.gov
                                        Email: McFallA@SEC.gov

                                        *Attorneys for the Plaintiff*


Of Counsel

Lindsay S. Moilanen