**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street NE Washington, DC 20549,<br><br>                    Plaintiff,<br><br>        v.<br><br>PATRICK ORLANDO,<br>c/o Vedder Price,<br>600 Brickell Ave, Ste. 1500<br>Miami, FL 33131,<br><br>                    Defendant. | No. 1:24-CV-2097 (CRC)<br><br><br>Jury Trial Demanded |

**DEFENDANT PATRICK ORLANDO'S MOTION**
**TO DISMISS THE COMPLAINT,**
**OR ALTERNATIVELY STRIKE PORTIONS OF**
**THE COMPLAINT, AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION....................................................................................................1

II.     STATEMENT OF RELEVANT ALLEGATIONS AND FACTS .............................5

        A.      SPAC A and Initial Merger Discussions with TMTG .........................5

        B.      DWAC Formation and Form S-1 Disclosures.....................................6

        C.      SPAC A and TMTG Took Significant Steps to Enter into a Definitive
                Merger Agreement ............................................................................8

        D.      Post-IPO, DWAC Actively Explored Other Targets Before Selecting
                TMTG ...............................................................................................9

III.    STATEMENT OF APPLICABLE LAW..................................................................12

IV.     ARGUMENT...........................................................................................................14

        A.      DWAC's Disclosures Were Not False or Misleading.......................15

                1.      Disclosures Relating to DWAC's Pre-IPO Discussions Were Not
                        Misleading...............................................................................15

                2.      The SEC Does Not Allege that SPAC A "Rejected" TMTG................19

        B.      The Alleged Misrepresentations Were Not Material .........................20

                1.      Statements Relating to DWAC's Preliminary Discussions About
                        Business Combinations Are Not Material ..............................20

                2.      Omission of the "Break-Up Fee Clause" Is Immaterial........................23

        C.      The SEC Has Not Properly Alleged that Mr. Orlando Acted with Scienter.......24

        D.      The SEC Fails to Allege that Mr. Orlando Obtained Money or Property as
                a Result of Fraud.............................................................................25

        E.      The SEC Fails to State a Claim for "Scheme" Liability ...................25

                1.      The SEC Fails to Sufficiently Allege Scheme Liability .......................26

                2.      The Scheme Liability Theory Is Implausible.......................................27

        F.      The SEC Fails to Allege Investor Harm Supporting Disgorgement .................30

V.      The SEC's Allegations Regarding its Settled Administrative Proceeding Against
        DWAC Should Be Stricken Pursuant to Rule 12(f).......................................33

VI.     CONCLUSION.......................................................................................................34

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980) ............................................................................................... 13, 24

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 12, 27, 30

*Barrett v. Atl. Monthly Grp. LLC*,
No. CV 22-49 (LLA), 2024 WL 4119400 (D.D.C. Sept. 9, 2024) ...................................... 1

*\*Basic v. Levinson*,
485 U.S. 224 (1988) .............................................................................. 1, 2, 20, 21, 22

*\*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................. 12, 27

*In re Burlington Coat Factory*,
114 F.3d 1410 (3d Cir. 1997) .................................................................................. 13, 20

*Corr. Officers Benevolent Ass'n of Rockland Cnty. v. Kralik*,
226 F.R.D. 175 (S.D.N.Y. 2005) ................................................................................. 5, 33

*Dent v. U.S. Tennis Ass'n*,
2008 WL 2483288 (E.D.N.Y. June 17, 2008) ................................................................. 34

*Dolphin & Bradbury, Inc. v. SEC*,
512 F.3d 634 (D.C. Cir. 2008) ......................................................................................... 24

*Gustave-Schmidt v. Chao*,
226 F. Supp. 2d 191 (D.D.C. 2002) ................................................................................... 3

*Howard v. SEC*,
376 F.3d 1136 (D.C. Cir. 2004) ....................................................................................... 24

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ...................................................................................... 33, 34

*\*Liu v. SEC*,
591 U.S. 71 (2020) ........................................................................................................... 31

*Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*,
No. H-15-100, 2015 WL 5825128 (S.D. Tex. Oct. 6, 2015) (Miller, J.) ............................. 30

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) .............................................................................. 34

# TABLE OF AUTHORITIES

Page

*Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago on behalf of
   Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.,*
   333 F. Supp. 3d 338 (S.D.N.Y. 2018), *aff'd,* 767 F. App'x 139 (2d Cir. 2019) .................... 13

*Samuel v. Wells Fargo & Co.,*
   311 F. Supp. 3d 10 (D.D.C. 2018) ....................................................................................... 5

*\*SEC v. Binance Holdings Ltd.,*
   Civil Action No. 23-1599 (ABJ),
   2024 WL 3225974 (D.D.C. June 28, 2024) ............................................. 13, 14, 25, 26, 27

*SEC v. Brown,*
   878 F. Supp. 2d 109 (D.D.C. 2012) ................................................................................... 26

*SEC v. e-Smart Techs., Inc.,*
   31 F. Supp. 3d 69 (D.D.C. 2014) ....................................................................................... 13

*SEC v. First City Fin. Corp.,*
   890 F.2d 1215 (D.C. Cir. 1989) .................................................................................. 31, 32

*SEC v. Goldstone,*
   952 F. Supp. 2d 1060 (D.N.M. 2013) ................................................................................ 27

*\*SEC v. Govil,*
   86 F.4th 89 (2d Cir. 2023) ................................................................................................. 31

*SEC v. Kelly,*
   817 F. Supp. 2d 340 (S.D.N.Y. 2011) ............................................................................... 26

*SEC v. Kokorich,*
   663 F. Supp. 3d 63 (D.D.C. 2023) ..................................................................................... 13

*SEC v. Levine,*
   517 F. Supp. 2d 121 (D.D.C. 2007),
   *aff'd,* 279 F. App'x 6 (D.C. Cir. 2008) .............................................................................. 32

*SEC. v. Miller,*
   808 F.3d 623 (2d Cir. 2015) .............................................................................................. 32

*SEC v. Nielson,*
   No. 118CV01217EGSGMH, 2020 WL 9439395 (D.D.C. Feb. 13, 2020) .......................... 31

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.,*
   296 F.R.D. 241 (S.D.N.Y. 2013) ......................................................................................... 5

*SEC v. Rio Tinto plc,* No. 17 CIV. 7994 (AT),
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ................................................................... 27

# TABLE OF AUTHORITIES

**Page**

*SEC v. Ripple Labs, Inc.*,
  No. 20 CIV. 10832 (AT), 2024 WL 3730403
  (S.D.N.Y. Aug. 7, 2024) ................................................................. 31

*\*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017) ........................................... 3, 13, 14, 25

*SEC v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020) ........................................ 26, 27

*SEC v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................. 25

*Shekoyan v. Sibley Int'l Corp.*,
  217 F. Supp. 2d 59 (D.D.C. 2002) ................................................ 14

*Stephenson v. Citco Grp. Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010) ............................................. 29

*Stephenson v. PricewaterhouseCoopers, LLP*,
  482 F. App'x 618 (2d Cir. 2012) ................................................. 29

*Taylor v. First Union Corp. of S.C.*,
  857 F.2d 240 (4th Cir. 1988) ............................................... 20, 21

*Wiggins v. Philip Morris, Inc.*,
  853 F. Supp. 457 (D.D.C. 1994) ................................................. 33

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ............................................. 17

## Other Authorities

17 C.F.R. 240.9b ........................................................ 1, 13, 14, 17

17 C.F.R. 240.12(f) .................................................. 1, 5, 24, 33, 34

17 C.F.R. § 240.12b-2 (2025) ................................................. 2, 21

15 U.S.C. 77q(a) .............................................. 2, 13, 14, 25, 26, 27

15 U.S.C. 78j(b) .................................... 1, 2, 12, 13, 14, 24, 26, 27

*Dissenting Statement Regarding Recent SPAC Cases - Digital World Acquisition
  Corp., N. Start Invest. Corp. II, and Cantor Fitzgerald, L.P.*, Speeches and
  Statements (SEC Dec. 12, 2024) ......................................... 1, 2, 21, 22

Pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and 12(f), Defendant Patrick Orlando moves to dismiss or strike portions of the Complaint filed by Plaintiff Securities and Exchange Commission ("SEC" or "Commission") arising from alleged pre-IPO communications between Digital World Acquisition Corp. ("DWAC"), a special purpose acquisition company ("SPAC"), and Trump Media & Technology Group[1] ("TMTG"), DWAC's post-IPO business combination target.

## I.    INTRODUCTION

This case should have never been brought—and even the SEC's Acting Chair thinks so. The crux of the SEC's claims is that Mr. Orlando signed off on certain language in DWAC's registration statements saying DWAC had not selected or engaged in substantive discussions with a business combination target before its IPO. However, the SEC fails to adequately allege that this language was **materially** false or misleading. Acting Chair Mark Uyeda says that it was not, finding that "information concerning a SPAC's preliminary merger negotiations" and other "day-to-day operations of a SPAC" is immaterial under the Supreme Court's analysis in *Basic v. Levinson*, 485 U.S. 224 (1988). *Dissenting Statement Regarding Recent SPAC Cases – Digital World Acquisition Corp., N. Start Invest. Corp. II, and Cantor Fitzgerald, L.P.*, Speeches and Statements (SEC Dec. 12, 2024) (attached as Ex. A).[2]

---

[1] Prior to August 2021, TMTG conducted business as Trump Media Group Corp. and is referenced in certain documents as "Trump Media" or "TMG."

[2] https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-spac-121224. The Court may take judicial notice of the article publishing Acting Chair Uyeda's dissent. *See Barrett v. Atl. Monthly Grp. LLC*, No. CV 22-49 (LLA), 2024 WL 4119400, at *7 (D.D.C. Sept. 9, 2024) (holding courts can take judicial notice of news article without converting motion to one for summary judgment).

Acting Chair Uyeda got it right. As the SEC has determined that non-binding letters of intent ("LOIs") are not material, certainly nonbinding discussions that precede such LOIs cannot be. *See Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date*, 69 Fed. Reg. 15593, 15596 at n.39 (Release Nos. 33-8400; 34-49424) (issued March 16, 2004), attached as Exhibit G at 5 (advising non-binding LOIs are not material for purpose of Form 8-K disclosure). Acting Chair Uyeda further observed that as a SPAC, DWAC's sole purpose was to combine with a target company, its investors accordingly expected management to communicate with potential merger candidates, and investors could redeem their shares upon completion of the merger if they did not approve of the target – meaning that allegedly misleading language about pre-IPO communications could not impact the decision-making of a reasonable investor. (*See* Ex. A at 4.)

In addition to failing the materiality element, the Complaint does not plausibly allege—with particularity—a false or misleading statement or omission, as required under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], nor the scienter necessary for claims under Sections 10(b) and 17(a)(1). When evaluated in the "context of the total mix of information" provided to the market, as required under the Supreme Court's analysis in *Basic*, the SEC's allegations do not establish any material misrepresentations or omissions in DWAC's public disclosures, nor a plausible scheme to defraud, as a matter of law, for the following reasons:

First, DWAC's pre-IPO filings explicitly advised that the company would and did leverage existing contacts of the management team (of which Mr. Orlando was the lead), disclosing:

- DWAC's intent to capitalize on the "competitive advantage" of its "access to a quality deal pipeline" through its management team's "contacts and sources from which to generate acquisition opportunities and possibly seek complementary

follow-on business arrangements." (DWAC May 25, 2021, Form S-1 at 12, 104,[3] attached as Ex. B; DWAC Aug. 31, 2021, Form S-1/A at 15, attached as Ex. F.)[4]

- DWAC's intent to source potential initial business combination targets through its management team's "wide network of professional services contacts and business relationships." (Ex. B at 16; Ex. F at 20.)

- DWAC's belief that "the network of contacts and relationships of [its] management team will provide [it] with an important source of acquisition opportunities" (Ex. B at 16, 108; Ex. F at 20, 116.)

- DWAC's intent to rely specifically on "Mr. Orlando's experience [which] covers all aspects related to special purpose acquisition corporations ('SPACs') as he has been involved as Executive, Sponsor and Director in several SPACs. . . Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets." (Ex. B at 10.)

- DWAC's expectation that it would "receive a number of deal flow opportunities that would not otherwise necessarily be available … as a result of the business relationships of our officers and directors and our sponsor and their affiliates." (Ex. B at 111; Ex. F at 119.)

Second, DWAC publicly disclosed key information regarding previous negotiations between Mr. Orlando's other SPAC ("SPAC A") and TMTG. (Ex. D at 165 (DWAC's Form S-4 detailing SPAC A's discussions with TMTG).) Likewise, DWAC engaged the very same experienced counsel for its disclosures of the TMTG acquisition as SPAC A had used in its own lengthy negotiations with TMTG, including in drafting and negotiating LOIs. Through this same counsel, DWAC disclosed (i) Mr. Orlando's relationship with SPAC A, as well as other SPACs that may have considered TMTG as a possible business combination, (ii) that SPAC A had not yet entered into a business combination, (iii) the overlap between the industry and geographic scope

---

[3] The page numbers reference the pagination of each PDF exhibit.

[4] In ruling on a motion to dismiss, the Court may consider "matters about which the Court may take judicial notice," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), such as "public records, including SEC filings." *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017).

of potential business combinations between DWAC and SPAC A, and (iv) the potential conflicts of interest that could exist as a result. (Ex. B at 116.)

Third, DWAC and TMTG disclosed in DWAC's Form S-4 their significant efforts to evaluate potential business combinations with dozens of other companies (concerning DWAC, these efforts were all *after* its IPO) before deciding to merge. It is simply not plausible to believe that TMTG willingly participated in the alleged scheme—making its own false disclosures and hampering its ability to obtain capital—for DWAC's and Mr. Orlando's benefit. Nor is it plausible to believe that TMTG intentionally invested months of its time and resources in a sham deal with SPAC A, held a ceremonial meeting between SPAC A and President Trump to sign the execution of a LOI in June 2021, and sacrificed seeking other financing options and potential acquirers (including a SPAC under exploration by President Trump's son) at a key point in its business operations, meanwhile hoping that DWAC would eventually complete its IPO and merge with TMTG. The Complaint's cherry-picked messages do not refute this implausibility.

Fourth, the Complaint also fails to allege scienter plausibly. The same counsel who drafted the DWAC disclosures at issue also drafted SPAC A's disclosures and handled negotiations with potential targets. They were deeply familiar with and had insight into all relevant facts and background when drafting DWAC's disclosures.

Finally, the SEC fails to plead facts supporting its request for disgorgement. It did not allege that Mr. Orlando illegally obtained profits, when such profits were allegedly obtained, the amount of such profits, or that DWAC investors suffered pecuniary harm—a requirement for the Court to award the equitable relief of disgorgement. Indeed, other than falling a couple of cents immediately after the IPO, the stock price has been well above the IPO level, at one point surging

higher than $90 per unit. More significantly, as is typical with a SPAC, DWAC offered investment protection through redemption rights, precluding any claim of investor harm.

Due to these fundamental and incurable flaws in the SEC's theory and pleading, the Court should dismiss the Complaint with prejudice. *See Samuel v. Wells Fargo & Co.*, 311 F. Supp. 3d 10, 17 (D.D.C. 2018) (dismissing plaintiff's fraud claims with prejudice because they were "fundamentally flawed"); *see also SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 254 (S.D.N.Y. 2013) (dismissing the SEC's claims for failure to state a claim and acknowledging that "[a] complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one").

Alternatively, at a minimum, the Court should strike the SEC's allegations and references to its settlement with DWAC per Rule 12(f), as administrative settlements and adjudications with non-parties are irrelevant and would be highly prejudicial to Mr. Orlando and his defense. *See, e.g., Corr. Officers Benevolent Ass'n of Rockland Cnty. v. Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y. 2005).

## II.    STATEMENT OF RELEVANT ALLEGATIONS AND FACTS

### A.    SPAC A and Initial Merger Discussions with TMTG

SPAC A was formed for the stated purpose of affecting a business combination. (Compl. ¶ 28; SPAC A December 28, 2020, S-1, at 10, attached as Ex. C.) As CEO and Chairman of SPAC A, Mr. Orlando's primary responsibility was identifying potential acquisition targets. (*See generally* Ex. C at 11.) Mr. Orlando also held positions in other SPACs. (*See* Ex. B at 10.)

In February 2021, a TMTG representative approached Mr. Orlando regarding a potential deal with SPAC A. (Compl. ¶ 32.) After engaging in initial discussions, SPAC A and TMTG signed a non-exclusive LOI to explore a potential merger. (*Id*. ¶ 33.) When the LOI expired in April 2021, SPAC A decided not to sign a mutually exclusive LOI with TMTG (*id*. ¶ 34), as

TMTG needed to undertake additional work before it would be ready for a merger. (DWAC May 16, 2022, Form S-4 at 166, attached as Ex. D.) Both parties began exploring other merger partners. (*Id.*; Compl. ¶¶ 34-35.)

B.     **DWAC Formation and Form S-1 Disclosures**

Meanwhile, in Spring 2021, Mr. Orlando became involved with DWAC, as a managing member of its sponsor and as CEO and Chairman of DWAC's Board of Directors. (Compl. ¶ 44.) Leading SPAC A and DWAC simultaneously, Mr. Orlando used the same experienced SPAC counsel to draft LOIs, handle merger negotiations, and prepare registration filings for both entities. (*Compare* Ex. B at 2 with Ex. C at 2.)

DWAC's initial Form S-1, filed by counsel on May 25, 2021 (*id.* ¶ 49), explicitly disclosed DWAC's intent to "capitalize on . . . competitive advantages in our pursuit of a target company," including management's established deal sourcing network, business relationships, and other contacts:

- ***Established Deal Sourcing Network***. We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get **access to quality deal pipeline**. In addition, we believe we, **through our management team** and financial advisor, **have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements**. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

(Ex. B at 12, 104 (emphasis added).)

- ***Sourcing of Potential Initial Business Combination Targets.*** Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have **developed a wide network of professional services contacts and business relationships in that industry.** The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and **bring additional relationships that further broaden our industry network.**

(*Id.* at 108 (emphasis added).)

- This network has provided our management team with a flow of referrals that have resulted in numerous transactions. **We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities.** In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

(*Id*. at 16, 108 (emphasis added).)

- *Sources of Target Businesses*. Our officers and directors, as well as our sponsor and their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. In addition, **we expect to receive a number of deal flow opportunities that would not otherwise necessarily be available to us as a result of the business relationships of our officers and directors and our sponsor and their affiliates.**

(*Id*. at 111 (emphasis added).)

Not only did DWAC repeatedly highlight its intent to identify acquisition targets from existing relationships, it also specifically identified **Mr. Orlando** as a likely source: "Over his career, Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets." (Ex. B at 10, 101.)

DWAC also disclosed in its initial and amended Forms S-1 (and later in its Form S-4): (1) Mr. Orlando's preexisting relationship with SPAC A, (2) that SPAC A had not yet entered into a business combination, and (3) the potential conflicts of interest that could result from Mr. Orlando's relationship with both SPAC A and DWAC. (*See, e.g., id.* at 10, 16, 70, 101, 108, 113, 132, 134, 140-42; Ex. F at 20, 78, 109, 116, 121, 140, 149-153; Ex. D at 29-30, 53-54, 144, 161, 165.)

Using the same counsel who was handling SPAC A's disclosures and negotiations with potential targets, DWAC's S-1 states that it had "not selected any specific business combination target" or engaged in "any substantive discussions . . . with any business combination target." (Ex.

-7-

B at 63.) DWAC amended these initial disclosures on July 8 and August 31, 2021, to include similar language regarding Mr. Orlando's SPAC experience and affiliations, DWAC's intent to rely on Mr. Orlando's "extensive network" and unique access to a "quality deal pipeline," DWAC's lack of "substantive discussions" with any business combination target, and its having "not selected any specific business combination target." (Compl. ¶¶ 79, 86.) DWAC also stated in its final Form S-1 that it had not contacted prospective business targets that SPAC A had "considered and rejected." (*Id.* ¶ 88; Ex. F at 17.)

Tellingly, the SEC does not allege that SPAC A ever "rejected" TMTG as a "potential target," nor can it, as documentary evidence unequivocally establishes otherwise. Further, the SEC does not allege that DWAC and TMTG had substantive discussions regarding a business combination before DWAC's IPO nor the details of any discussions between DWAC and TMTG, beyond a vague reference to "Plan B." (Compl. ¶¶ 37, 39.)

### C. SPAC A and TMTG Took Significant Steps to Enter into a Definitive Merger Agreement

After months of negotiations, SPAC A and TMTG executed an LOI with a unilateral exclusivity provision in favor of SPAC A on June 4, 2021. (Compl. ¶ 57; June 4, 2021, LOI between SPAC A and TMTG, attached as Ex. E.) The LOI provided for a $1 million payment by Mr. Orlando if SPAC A and TMTG failed to enter into an acquisition agreement by August 6, 2021, unless (1) TMTG were provided with an alternative SPAC recommendation, subject to its discretion and approval; (2) TMTG elected to terminate the LOI for any reason; (3) SPAC A determined that TMTG "unreasonably delay[ed] its agreement to the terms of the Acquisition Agreement or frustrate[d] its completion;" or (4) SPAC A executed and delivered its signature

pages of the Acquisition Agreement (i.e., the definitive business combination agreement) to TMTG. (Ex. E at 6.)[5]

In July and August 2021, SPAC A and TMTG extended the June 2021 LOI, as TMTG continued its efforts to become merger ready and to negotiate a definitive merger agreement. (Ex. D at 166.) By late August 2021, however, it became clear to SPAC A that TMTG was not a suitable merger candidate for several reasons, including but not limited to President Trump declaring his services agreement with TMTG *void ab initio*. (*See id.*) Ultimately, SPAC A and TMTG mutually agreed to terminate their LOI effective as of September 1, 2021. (*Id.*; Compl. ¶ 57.)

### D.  Post-IPO, DWAC Actively Explored Other Targets Before Selecting TMTG

DWAC's IPO commenced on September 3, 2021, and closed on September 8, 2021. (*Id.*) DWAC began exploring merger opportunities afterward by sending draft non-disclosure agreements ("NDAs") to more than nine companies in addition to TMTG. As the SEC acknowledges, between September 8 and 21, 2021, DWAC's Board of Directors voted to negotiate and execute LOIs with four potential merger targets, including TMTG. (Compl. ¶¶ 94-99.) After participating in meetings and negotiations, DWAC determined that all potential targets except TMTG ultimately were not viable options, for various reasons delineated in its Form S-4. (Ex. D at 167-68.) DWAC described its fulsome consideration of potential targets, other than TMTG, in its Form S-4, summarized as follows:

| DATE | EXPLORATION OF TARGETS |
|---|---|
| 9/9/2021 | • "Digital World considered a potential transaction with Target B and reached out to its banker; however Digital World was informed that Target B had different timing objectives and declined to move forward with Digital World." (Ex. D at 167.) |

---

[5] The SEC Complaint notably omits the broad exceptions (2) through (4).

| **DATE** | **EXPLORATION OF TARGETS** |
|---|---|
|  | • "Digital World conducted an extensive meeting with Target C's management at Digital World's offices in Miami, FL. The target's business was discussed thoroughly, and the points discussed included customer pipeline, commercial application, turnaround time, intellectual property, financials, cap table, and pre-IPO financing." (*Id.*)<br><br>• "Digital World reviewed Target M's materials." (*Id.*) |
| 9/13/2021 | • "Digital World and Target K conducted a video conference. Topics discussed included total addressable market, revenue, revenue growth, audits, customer concentration, cash requirement, competitive advantage, and financial projections." (*Id.*) |
| 9/16/2021 | • With respect to Target M, "because the company required several years of research and development before its products will be in position to go to market, it was determined that this company would not be an appropriate target for Digital World." (*Id.*)<br><br>• "Digital World, after discussions with Target L, analyzed Target L's potential for business combination and determined that it would not further consider the company because its PCAOB audits were not yet complete and the company had not yet closed a private raise required to execute a merger prior to moving forward with a business combination." (*Id.*)<br><br>• "Digital World concluded that Target K's management was seeking a cash-out via the proposed business combination, and on that basis ceased discussions with Target K." (*Id.*)<br><br>• "Digital World paused discussions with Target N when it was determined that the company's business plan was disperse." (*Id.*)<br><br>• "Digital World ceased discussions with Target M when it was determined that the company's product suite would not be available in the requisite amount of time to make it a viable business combination target." (*Id.*)<br><br>• "Digital World received inbound leads from an investment bank regarding two potential targets that could be acquired individually or together. Management determined not to pursue these leads as Digital World advanced conversations with other |

| **DATE** | **EXPLORATION OF TARGETS** |
|---|---|
| | targets and proceeded to sign an exclusive LOI with TMTG." (*Id.*) |
| 9/17/2021 | • "Target D was introduced to Digital World by EF Hutton, acting solely in its capacity as Digital World's IPO underwriter, and an NDA was executed." (*Id.* at 168.) |
| 9/20/2021 | • "Mr. Orlando sent the Board information that had been prepared by BIG LLC regarding seven potential targets, including TMTG." (*Id.*) |
| | • "Digital World reviewed Target D's materials and spoke with its management." (*Id.*) |
| | • "Digital World reviewed Target J's materials and had conversations with its management." (*Id.*) |
| 9/21/2021 | • "Digital World asked for access to Target H's data room but was told the target was under exclusive LOI with another SPAC." (*Id.*) |
| | • "Digital World held a board meeting where the Board discussed various potential targets, including, but not limited to, TMTG. At that time, the Board determined that Digital World should seek to move forward with LOIs with Target A, among others, and TMTG for the time being." (*Id.*) |
| | • "Digital World was granted access to Target C's data room. However, Digital World was also informed by Target C's investment bank that the company was evaluating internally and could not move forward at that time." (*Id.*) |
| | • "Digital World signed an LOI with Target A and held multiple discussions with its Chief Executive Officer that same day. . . Conversations progressed into the evening and overnight, and it was determined that in order to close the deal, Target A, in addition to the entire amount of cash in trust, would require a capital raise of an additional $300 million. Given the state of the PIPE market, redemption rates, and industry of Target A, Digital World's management and Board later agreed that Target A's large cash requirements could pose a challenge in the market environment." (*Id.*) |
| 9/22/2021 | • "Target A granted Digital World access to its data room." (*Id.*) |

| DATE | EXPLORATION OF TARGETS |
|------|------------------------|
|      | • "Digital World had another management call with Target D. Digital World liked the company's plan and niche in the space but determined that the company's enterprise value was too small relative to the size of Digital World." (*Id.*) <br><br> • "Digital World was provided access to Target E's data room." (*Id.*) |

DWAC also engaged with TMTG during the same post-IPO period. With TMTG having terminated its LOI with SPAC A effective September 1, 2021 (Ex. D at 166), TMTG began negotiating an NDA with DWAC on September 8, 2021, exchanging multiple drafts. (*Id*. at 166-67.) On September 13, 2021, the parties executed a final NDA, the first step to evaluating a company. (*Id*.) On September 14, 2021, TMTG sent DWAC a draft LOI. (*Id*.) After extensive negotiations over substantial deal terms and sharing of information, and with the approval of DWAC's Board, Mr. Orlando signed a mutually exclusive LOI between DWAC and TMTG on September 22, 2021. (*Id*. at 169; Compl. ¶ 100.) On September 29, 2021, TMTG provided DWAC and its counsel access to its data room. (Ex. D at 169.) After nearly a month of substantive arms-length negotiations, DWAC and TMTG signed a definitive merger agreement on October 20, 2021. (*Id*. at 170; Compl. ¶ 101.) On May 16, 2022, DWAC filed a Form S-4 with the SEC seeking approval for its planned merger with TMTG. (Compl. ¶ 103.)

## III.    STATEMENT OF APPLICABLE LAW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If "plaintiffs have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To establish a claim under Section 10(b) and Rule 10b-5, the SEC must show that (1) Mr. Orlando "made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014). Section 17(a) requires the SEC to establish largely the same elements, although scienter is not an element under subsections (a)(2) or (a)(3). *See Aaron v. SEC*, 446 U.S. 680, 701 (1980). Section 17(a)(2) requires additional proof that the defendant obtained money or property as a result of the misstatements or omissions. *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 14 (D.D.C. 2017).

A statement or omission is materially misleading "if a reasonable investor, reading the statement fairly and in context, would be misled." *SEC v. Kokorich*, 663 F. Supp. 3d 63, 76 (D.D.C. 2023) (internal citations omitted); *see also In re Burlington Coat Factory*, 114 F.3d 1410, 1425-26 (3d Cir. 1997) ("The omission or misstatement must also be material, i.e., something that would alter the total mix of relevant information for a reasonable investor making an investment decision."); *SEC v. RPM*, 282 F. Supp. 3d at 23 (holding omission actionable only if "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). "[A] complaint should be dismissed on the basis of materiality where the alleged misstatement is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago on behalf of Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*, 333 F. Supp. 3d 338, 347 (S.D.N.Y. 2018), *aff'd*, 767 F. App'x 139 (2d Cir. 2019); *see also SEC v. RPM*, 282 F. Supp. 3d at 23.

The SEC must also meet the heightened requirements of Rule 9(b) for fraud claims. *See SEC v. Binance Holdings Ltd.*, Civil Action No. 23-1599 (ABJ), 2024 WL 3225974, at *5 (D.D.C.

June 28, 2024) ("The D.C. Circuit applies Rule 9(b)'s pleading standards to claims of misrepresentation under Section 10(b) of the Exchange Act."); *see also SEC v. RPM*, 282 F. Supp. 3d at 13 (D.D.C. 2017) (citing *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017)) (concluding that Section 17(a) claims "all sound in fraud," so they must be pled with particularity).

"Conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy 9(b)." *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002). Rather, to meet the requirements of Rule 9(b), the SEC must plead (i) "the time, place and content of the false misrepresentations," (ii) "the fact misrepresented," and (iii) what was retained or given up as a consequence of the fraud." *Binance Holdings Ltd.*, 2024 WL 3225974, at *5 (D.D.C. June 28, 2024).

## IV.    ARGUMENT

The Court should dismiss the Complaint against Mr. Orlando for failure to state a plausible claim under either Section 10(b) or Section 17(a) for the following reasons. First, the language upon which the SEC bases its allegations is not false or misleading. Second, the purported misstatements are immaterial because they would not impact a reasonable investor's decision whether to invest when viewed (as they must) in the total mix of information provided to investors. Third, the alleged omissions are immaterial because they do not alter the total mix of information made available to investors. Fourth, the SEC does not plausibly allege that Mr. Orlando acted with scienter. And, dooming its Section 17(a)(2) claim, the SEC has not pled that Mr. Orlando personally obtained any money or property as a result of the alleged misstatements or omissions. The SEC also fails to adequately plead scheme liability, which requires more than a mere misrepresentation.

Finally, the SEC's claim for disgorgement is precluded by the redemption rights provided to DWAC's investors and the absence of any investor harm.

-14-

A.     **DWAC's Disclosures Were Not False or Misleading**

1.     Disclosures Relating to DWAC's Pre-IPO Discussions Were Not Misleading

The SEC alleges that the following statements in DWAC's August 2021 Form S-1 constitute misrepresentations:

> "To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us."

> "We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination."

> "We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive to our stockholders."

(Compl. ¶¶ 86-88; Ex. F, at 12; 17; 119.)

The SEC further contends that DWAC's Form S-4 misleadingly failed to disclose Mr. Orlando's release from a personal obligation to pay a break-up fee in the event SPAC A and TMTG did not enter into an acquisition agreement (the "Break-Up Fee Clause"), as well as his interactions with TMTG prior to DWAC's IPO. (Compl. ¶¶ 103(a), 103(b).) Specifically, the SEC alleges the following statements in DWAC's Form S-4 to be materially false and misleading:

- In February 2021, TMTG called Mr. Orlando, who was the Chief Executive Officer of [SPAC A], a SPAC that had completed its initial public offering in January 2021, regarding the possibility of TMTG engaging in a business combination with SPAC A. Mr. Orlando had no prior relationship with the TMTG representative or President Trump before this call. As disclosed in Digital World's IPO prospectus, Mr. Orlando serves as Chairman and Chief Executive Officer of SPAC A, and Messrs. Shaner and Swider serve as independent directors of SPAC A.

- TMTG and SPAC A executed an NDA in February 2021. Discussions between TMTG and SPAC A stalled in April 2021.

- TMTG signed a LOI with SPAC A in June 2021. Following the LOI signing, SPAC A continued due diligence, and SPAC A and TMTG began negotiating a definitive agreement ("Acquisition Agreement"). The parties also agreed to certain extensions of the LOI in July and August 2021.

- SPAC A and TMTG executed multiple extensions to the signing date deadline of an Acquisition Agreement. SPAC A and TMTG mutually agreed to terminate their LOI effective September 1, 2021.

(Ex. D at 165-66.)

The SEC contends that these disclosures were misrepresentations because Mr. Orlando communicated with TMTG on behalf of SPAC A, but then negotiated TMTG's ultimate merger with DWAC. The SEC's argument is problematic for two reasons.

First, the SEC fails to allege that Mr. Orlando had substantive discussions with TMTG and agreed to a business combination **on behalf of DWAC** before its September 2021 IPO. The sole communication referenced in the Complaint is an April 14, 2021 discussion with TMTG's executives concerning SPAC A, in which the SEC alleges that Mr. Orlando mentioned that "if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.,* that Orlando would

try to identify **another vehicle to potentially pursue** a merger with TMTG." (Compl. ¶ 39 (emphasis added).) This allegation is far from a "substantive discussion" on behalf of DWAC (let alone another SPAC). Indeed, the SEC's allegations concede that Mr. Orlando had not even been introduced to DWAC until April 24, 2021 – ten days after the April 14 statement – and that he did not assume control of DWAC until an entire month after, on May 14, 2021. (*Id.* ¶¶ 44, 48.) This confirms that the "Plan B" was any financing option other than SPAC A, which could include a merger with one of the other SPACs Mr. Orlando was actively involved with or another financing opportunity. (*See* Ex. B at 10.) Nor does this allegation meet the exacting standards of Rule 9(b). *See, e.g., In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 184 (D.D.C. 2007) (dismissing securities fraud claims for failure to satisfy pleading standards under Rule 9(b)).

Second, the SEC fails to support its allegation that DWAC determined pre-IPO that it would combine with TMTG. The allegations upon which the SEC relies establish only what DWAC disclosed in its Forms S-1 and S-4: that DWAC may have the opportunity to pursue unique targets based upon the preexisting business relationships of its executives. (*See, e.g.,* Compl. ¶¶ 47, 55, 56, 63, 65, 68.) That Mr. Orlando prepared a spreadsheet discussing hypothetical business combinations (*id.* ¶ 47) does not show otherwise. Rather, it is just that – evidence that he was gauging the pipeline of potential targets that may be available for DWAC to pursue after its IPO. Likewise, the SEC makes much of a non-DWAC employee asking Mr. Orlando whether there was "any brochure ready of the TMG SPAC." But his response was to correct the misunderstanding, stating "There is no TMG SPAC. There is a SPAC and I have a great relationship with TMG. I believe with extremely high confidence that TMG will [end] up in one of my SPACs." (*Id.* ¶ 56.) Mr. Orlando's statement is completely consistent with the representations made in DWAC's public disclosures.

By cherry-picking statements, the SEC ignores key disclosures regarding DWAC's intent to identify potential business combination targets through the **pre-existing business relationships** of Mr. Orlando and others affiliated with DWAC.

DWAC's Forms S-1 disclosed that DWAC would rely on an "established deal sourcing network" to access a "quality deal pipeline" through Mr. Orlando and others:

> ***Established Deal Sourcing Network****.* We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to **quality deal pipeline**. In addition, we believe we, through our management team and financial advisor, have **contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements**. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

(Ex. B at 12, 104 (emphasis added).) DWAC further disclosed that Mr. Orlando and other members of DWAC's management team had already "developed a wide network of professional services contacts and business relationships" in the industries in which DWAC was attempting to locate a suitable target, and DWAC elaborated that the "network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities." (*Id.* at 16, 108.)

DWAC highlighted Mr. Orlando's professional experience and business relationships, noting that "[o]ver his career, Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets." (Ex. B at 10, 101.) DWAC also explicitly disclosed: (1) Mr. Orlando's preexisting relationship with SPAC A; (2) that SPAC A had not yet entered into a business combination; and (3) the potential conflicts of interest that could result from Mr. Orlando's relationship with both SPAC A and DWAC. (*Id.* at 10, 16, 70, 101, 108, 113, 132, 134, 140-42.)

DWAC further disclosed to potential investors that DWAC "expect[s] to receive a number of deal flow opportunities that would not otherwise necessarily be available to [DWAC] **as a result of the business relationships of [DWAC's] officers and directors and our sponsor and their affiliates**." (*Id*. at 111 (emphasis added).) The initial Form S-1 accurately advised that DWAC representatives had not yet discussed any initial business combination with contacts, but "may contact such targets" after completion of the IPO. (*Id*.) These statements were reiterated in subsequently amended Forms S-1 and S-4 filed by DWAC. Colorful braggadocio aside, Mr. Orlando's statement that he was confident TMTG would end up in "one of [his] SPACs" based on his relationship with TMTG and his boast that "[i]t's ours wherever we want" (*id*. ¶¶ 56, 66), demonstrates precisely what DWAC disclosed—DWAC would have access to a unique pipeline of potential targets based upon its executives' preexisting business relationships.

## 2.    The SEC Does Not Allege that SPAC A "Rejected" TMTG

The SEC also points to the following disclosure in DWAC's August 31, 2021, Form S-1 as misleading:

> **We have not contacted any of the prospective target businesses that [SPAC A and another SPAC] had considered and rejected.** We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

(Ex. F at 17 (emphasis added).)

As a preliminary matter, it is neither surprising nor inconsistent with DWAC's disclosures that Mr. Orlando actively communicated with TMTG before DWAC's IPO through his role as CEO of SPAC A because the two entities were engaged in ongoing negotiations regarding a potential business combination until September 1, 2021. Again, the same experienced counsel who

guided SPAC A's negotiations with TMTG also served as DWAC's disclosure counsel and drafted the very disclosures at issue.

Further, the representation is not misleading. TMTG's own SEC disclosures demonstrate that SPAC A had not "rejected" TMTG as a target business as of the date of the disclosure. Rather, TMTG's disclosures assert that it previously entered into an LOI with SPAC A, ceased negotiations, later re-engaged in discussions regarding a potential business combination, and entered into a second LOI. (Ex. D at 165-66.)

Because DWAC's disclosures were not misleading, the Complaint should be dismissed.

## B.    The Alleged Misrepresentations Were Not Material

The SEC's claims also fail because the disclosures underlying the allegations are not material as a matter of law.

### 1.    Statements Relating to DWAC's Preliminary Discussions About Business Combinations Are Not Material

DWAC's statements that DWAC had not substantively communicated with or selected a specific business combination target are not material, for at least three reasons.

First, *Basic* established that preliminary merger discussions are not per se material; materiality depends on the circumstances of the merger. 485 U.S. at 238-39. Courts have consistently held that preliminary discussions, *without more*, do not meet the materiality threshold. *See, e.g., In re Burlington Coat Factory*, 114 F.3d at 1427 (holding that preliminary discussions are not material absent concrete steps towards a merger); *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244 (4th Cir. 1988) (finding preliminary merger discussions were not material). In the SPAC context, as here, the sole purpose is to find a business combination partner. Accordingly, preliminary discussions with potential targets—even substantive ones—do not rise to the level of

materiality because investors know and expect SPACs to be talking with potential targets at all times.

Applying the Supreme Court's analysis in *Basic*, the SEC's Acting Chair found that DWAC's purported misrepresentations were not material. He observed that "the sole job of a SPAC's board and senior management is to identify a target company for acquisition," and "a SPAC's investors do not require a 'play-by-play' in how the SPAC's board arrived at its decision to select a particular target company for acquisition." (*Id*.) Distinguishing SPACs from operating companies, Acting Chair Uyeda explained:

> Unlike the corporation discussed in *Basic*, [DWAC's] stated purpose was to acquire a target company. The SPAC's 'death' is planned for and sought after from the time the SPAC is formed. Given this distinction, the probability/magnitude test[6], as applied to information concerning a SPAC's preliminary merger negotiations, should result in such information not becoming material until a time much closer to the SPAC and target company reaching a binding agreement on the acquisition price and structure. Any discussions prior to such time, **even if they are "substantive,"** are part of the day-to-day operations of a SPAC.

(Ex. A at 4 (emphasis added).) Acting Chair Uyeda was not merely opining on SPACs in general. He was explicitly addressing **DWAC's** disclosures, finding that any misrepresentation about pre-IPO discussions with TMTG was not material in light of the total mix of information disclosed.

Second, the redemption rights provided to DWAC investors (as is typically the case with SPACs) allow the option to redeem their units upon completion of the business combination if they disapprove of DWAC's decision to merge with TMTG, rendering the purported

---

6 The "probability/magnitude test" to which Acting Chair Uyeda referred is the test of materiality outlined in *Basic* and codified in Rule 405 of the Securities Act of 1933. Rule 405 provides: "The term material, when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to purchase the security registered." 17 C.F.R. § 240.12b-2 (2025).

misrepresentations immaterial. (Ex. D at 8).[7] As Acting Chair Uyeda explained, "[a] common feature among SPACs [including DWAC] is the right of investors to redeem their shares in the SPAC upon completion of the de-SPAC transaction. This right protects investors by allowing them to exchange their shares for an amount approximate to the SPAC's IPO price, plus interest." (Ex. A at 5.) Given this extraordinary protection available to DWAC's investors, details regarding preliminary business combination discussions cannot rise to the level of materiality under the Supreme Court's analysis in *Basic*.

Additionally, the SEC does not, and cannot, cite to any law, rule, or regulation that prohibits Mr. Orlando's pre-IPO discussions and dealings with TMTG on behalf of DWAC. In fact, it is industry practice not to disclose the execution of LOIs between SPACs and targets in Form 8-K filings with the SEC because such agreements are not definitive and therefore do not constitute a material change warranting disclosure. *See* Form 8-K Instructions, Item 1.01 (requiring disclosure of only a "material **definitive** agreement") (emphasis added), available at: https://www.sec.gov/files/form8-k.pdf. When revising its public disclosure requirements, the SEC specifically considered and rejected the idea of requiring LOIs and other non-binding agreements to be disclosed, noting commenters' concerns that "disclosure of non-binding agreements could cause significant competitive harm to the company and create excessive speculation in the market." (*See Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date*, Ex. G at 5.) If the SEC does not deem entering into an LOI to be a material event, preliminary merger conversations prior to an LOI are certainly not material. *See id.*

---

[7] Acting Chair Uyeda specifically acknowledged that DWAC's disclosures on this point were sufficient. (Ex. A at 4.)

Third, regardless of whether the statements or alleged omissions identified by the SEC are material, they cannot as a matter of law be considered misleading in light of the total mix of information made available to DWAC's investors. DWAC's Forms S-1 made numerous disclosures regarding Mr. Orlando's access to a pipeline of potential business combinations, his involvement in other SPACs, and the possibility that DWAC may choose to evaluate targets considered by other SPACs for which Mr. Orlando was involved. (*See* section II.B.) In fact, investors likely relied on these very statements as justifications *for* investing in DWAC. Given the breadth of the disclosures, the goal of each SPAC, and reasonable SPAC investors' expectations, the statements and alleged omissions identified by the SEC are not materially misleading.

### 2. Omission of the "Break-Up Fee Clause" Is Immaterial

Nor does DWAC's failure to specifically mention the Break-Up Fee Clause in the SPAC A/TMTG LOI constitute a material omission in DWAC's Form S-4. The SEC's Complaint suggests that the only exception to the June 4, 2021, SPAC A/TMTG LOI's Break-Up Fee Clause—i.e., the requirement that Mr. Orlando personally pay a $1 million fee to TMTG if SPAC A did not combine with TMTG—was if Mr. Orlando identified another SPAC with which TMTG could combine. (Compl. ¶ 61.) But that is simply false; the Break-Up Fee Clause contains multiple exceptions, including for "frustration," so it was highly unlikely Mr. Orlando would ever owe a break-up fee to TMTG. (*See* Ex. E at 6-7.) The exceptions were so broad that the presence of the Break-Up Fee Clause could not plausibly impact a reasonable SPAC investor's decision as to whether to invest in DWAC. In any event, the Form S-4 filing made clear that "[t]he interests of the Sponsor or current officers or directors of Digital World may be different from or in addition to (and which may conflict with) [the investors'] interest[s]". (Ex. D at 29.)

### C.    The SEC Has Not Properly Alleged that Mr. Orlando Acted with Scienter

The SEC likewise fails to sufficiently allege Mr. Orlando acted with scienter, a necessary element of Section 10(b), Rule 10b-5, and Section 17(a)(1). *See Aaron*, 446 U.S. at 697. Specifically, "the SEC must establish an intent to deceive, manipulate, or defraud." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (internal citations omitted). Reliance on the advice of counsel is "evidence of good faith" and therefore a "relevant consideration in evaluating a defendant's scienter." *Howard*, 376 F.3d at 1147 (D.C. Cir. 2004) (citation omitted).

With the same experienced SPAC corporate counsel advising both SPAC A and DWAC, both generally and as to each entity's public disclosures, including the disclosures at issue, such counsel had full knowledge of SPAC A's interactions with TMTG (including the Break-Up Fee Clause) at the time it drafted DWAC's registration statements on which the SEC relies. (*See* Ex. B at 2; Ex. C at 2.) Mr. Orlando's good faith reliance on competent, informed counsel demonstrates lack of intent to mislead investors and renders the SEC's allegation of scienter implausible. *See, e.g., Howard v. SEC*, 376 F.3d 1136, 1148 (D.C. Cir. 2004) (holding that officer can rely on corporate counsel to demonstrate "due care or good faith"). The SEC ignores this critical fact, despite it being clearly disclosed in SPAC A and DWAC's registration statements that the same law firm represented both entities.

Instead, the SEC focuses its Complaint on a handful of cherry-picked text messages, primarily sent by individuals other than Mr. Orlando, ignoring context that flatly negates scienter. For example, when someone implied that DWAC was the "TMG SPAC" (using TMTG's prior acronym), Mr. Orlando unequivocally stated, "There is no TMG SPAC." (Compl. ¶ 56.) He also reiterated "[t]here is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals." (Compl. ¶ 72.) In short, he said exactly what he should have to **avoid** misleading investors. Mr. Orlando enthusiastically pursued TMTG as a

potential merger candidate for SPAC A, pursuing it as a target until it was clear it was not the best choice for SPAC A, when both parties mutually terminated the LOI effective September 1, 2021. Only after DWAC's IPO on September 8, 2021, did Mr. Orlando, on behalf of DWAC, begin communicating with TMTG as a merger target. Additionally, Mr. Orlando never hid his business relationship with TMTG; it was appropriately disclosed in DWAC's SEC filings. (Ex. D at 165.) These facts defeat any claim of scienter.

### D. The SEC Fails to Allege that Mr. Orlando Obtained Money or Property as a Result of Fraud

 "To state a claim under Section 17(a)(2), the SEC must show… that defendants obtained money or property through the use of the misstatements or omissions." *SEC v. RPM*, 282 F. Supp. 3d at 14; *see also SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (dismissing a Section 17(a)(2) claim because "[i]t is not sufficient that a materially untrue statement was made and the person also made money" and "[i]t must be plausibly alleged that the money was obtained 'by the means of' the false statement."). The SEC has not offered any specific allegations regarding any money or property Mr. Orlando obtained as a result of the alleged misrepresentations or omissions. Its conclusory statement that Mr. Orlando "obtained money or property by means of any untrue statement of material fact or omission…" (Compl. ¶ 111) does not suffice. *See Binance Holdings Ltd.*, 2024 WL 3225974 at *4 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Accordingly, the SEC's Section 17(a)(2) claim must be dismissed.

### E. The SEC Fails to State a Claim for "Scheme" Liability

The SEC alleges that Mr. Orlando engaged in a fraudulent "scheme" to use DWAC, before its IPO, to pursue a merger with TMTG. (Compl. ¶ 4.) The allegations fail to cross the plausibility threshold, lacking sufficient facts demonstrating misconduct independent from the alleged

misrepresentations, materiality, or scienter that form the basis of the SEC's misrepresentation claims. *See SEC v. Sason*, 433 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020) ("To state a scheme liability claim, the SEC must allege "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter.").

1.    The SEC Fails to Sufficiently Allege Scheme Liability

To establish scheme liability under Rule 10b-5(a) or (c) or Section 17(a)(1) or (3), "the alleged conduct must include more than the same misrepresentations and omissions underlying the misstatement claims." *Binance Holdings Ltd.*, 2024 WL 3225974 at *38. "[S]cheme liability is only appropriate if Section 17(a)(2) cannot fully cover the deceptive acts." *Id.*; *see also SEC v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("[T]o establish [scheme liability] under Rule 10b-5(a) or (c), the alleged conduct must be more than a reiteration of the misrepresentations underlying the Rule 10b-5(b) misstatement claims."); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability. . . hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.").

Here, the SEC's sole allegations supporting its scheme claims are that Mr. Orlando signed off on misrepresentations made in DWAC's public filings. Because the SEC has failed to allege any deceptive act distinct from the alleged misrepresentations, its scheme liability claims must be dismissed. *Kelly*, 817 F. Supp. 2d at 344 (dismissing scheme liability claim where the SEC failed to allege any inherently deceptive act and the only alleged wrongful acts were public misrepresentations).

The Complaint does not even attempt to distinguish the conduct allegedly supporting its Section 10(b) and/or Section 17(a)(1)-(2) claims from the allegedly deceptive conduct by Mr. Orlando that went *beyond* the purported misrepresentations to give rise to scheme liability under Section 17(a)(3) or Section 10b-5(a) or (c). As a matter of law, Mr. Orlando cannot be liable

-26-

for a violation of Section 17(a) "if the only allegation is that [he] was a participant in a scheme through which the misleading statements were made." *Binance Holdings Ltd.*, 2024 WL 3225974, at *38; *see also SEC v. Rio Tinto plc*, No. 17 CIV. 7994 (AT), 2019 WL 1244933, at *16 (S.D.N.Y. Mar. 18, 2019) (holding that the SEC failed to state a claim for scheme liability where "everything listed is either a misstatement or omission that would form the basis of liability under Rule 10b-5"); *see also SEC v. Sason*, 433 F. Supp. 3d at 511 (dismissing a claim for scheme liability where the SEC failed to "lay out any specific factual details regarding the alleged agreement to implement [the] scheme" and "allege[d] in [a] conclusory fashion that the [defendant's] transactions were a sham"); *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1236 (D.N.M. 2013) (dismissing the SEC's claim for scheme liability because "[t]he fatal problem with the SEC's allegations of scheme liability is that, apart from the alleged misrepresentations and omissions . . . none of the conduct the SEC references in furtherance of the scheme is inherently deceptive"). Consequently, the SEC's claims based upon scheme liability fail as a matter of law and must be dismissed.

### 2.    The Scheme Liability Theory Is Implausible

In addition to the SEC's failure to properly allege facts or conduct that would independently give rise to scheme liability, its scant allegations regarding Mr. Orlando's "scheme" do not cross the line "from conceivable to plausible." *Bell Atl. Corp.*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."). It is not plausible to assume that Mr. Orlando could "select" TMTG as DWAC's ultimate target (let alone before Mr. Orlando even had any relationship with DWAC as the SEC appears to concede). (*See* supra at section IV.A(1).)

The SEC's theory presupposes that Mr. Orlando had the *ability* to preselect TMTG as DWAC's business combination target in advance of DWAC's fundraising and IPO. At no point

did Mr. Orlando have any internal or external control over TMTG or its operations, and the SEC does not allege otherwise. Any decision by TMTG to sign exclusive LOIs or negotiate a potential merger was made by TMTG personnel after presumably determining that such a decision was the best course of action for the entity. A business combination between DWAC and TMTG could occur only after numerous events fell into place based on multiple factors entirely outside of Mr. Orlando's control (including President Trump entering into a binding services agreement with TMTG, TMTG securing a PCAOB-qualified auditing firm, advancements in TMTG's proposed social media network, etc.), none of which were known or predictable with any level of certainty at any point before DWAC's IPO. (*See generally* Ex. D at 166-171.) Based on these undisputed facts, the SEC's theory is implausible and not supported by any of the alleged facts. Moreover, the Complaint acknowledges that Mr. Orlando had no involvement with DWAC's sponsor until May of 2021. (Ex. B at 134; Compl. ¶ 44.) Any communications relied upon by the SEC prior to that time are wholly irrelevant, as Mr. Orlando lacked even the theoretical ability to direct or control either side of any proposed transaction.

Similarly implausible is the SEC's allegation that DWAC's post-IPO consideration of potential targets other than TMTG was entirely pretextual. Such a theory would mean that DWAC's consideration of other targets was designed and carried out at great expense solely to deceive the SEC and the public based on the offhand chance that regulators subsequently scrutinized its purportedly preordained merger with TMTG. It is well-documented that DWAC dedicated substantial resources and effort to identify, vet, and negotiate with other potential targets, as disclosed in DWAC's Form S-4. (*See* Ex. D at 167.)

The SEC acknowledges that, after DWAC's IPO on September 8, 2021, it sent draft NDAs to over ten potential targets. (Compl. ¶ 93; Ex. D at 166.) In fact, DWAC disclosed a

comprehensive timeline of communications with at least 12 potential targets between September 8 and September 22, 2021. (*Id.* at 166-68.) Disregarding the vast majority of the communications detailed in the disclosure, the SEC dismisses Targets B, G and I as improper subjects of discussion at a DWAC Board meeting on September 21, 2021, as they were allegedly unavailable opportunities. (Compl. ¶¶ 94-99.) That certain targets were ultimately unavailable on the date of DWAC's Board meeting does not negate the work done to affect a potential transaction or render the disclosures false. As DWAC's May 16, 2022, S-4 filing reflects, DWAC was advised of Target B's unavailability only *after* contacting Target B on September 9, 2021. (*See* Ex. D at 167.) Moreover, the SEC does not allege with any particularity the subject matter of the discussion that allegedly occurred in DWAC's September 21, 2022, Board meeting, or that such discussion was a material fact omitted or misstated in DWAC's disclosures. Regardless, the SEC ignores nearly a dozen other targets DWAC disclosed as having considered following its IPO. (*See* Ex. D at 166-67.)

The SEC's theory also requires TMTG and President Trump himself to have willingly acted against their own business interests, which is not plausible. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd on other grounds sub nom.*, *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012), as amended (June 13, 2012) (finding that plaintiff's theory requiring PWC to act against its own business interests was not plausible). That TMTG would lock itself into an exclusive LOI with SPA, restricting its own ability to seek investors or pursue alternative business combinations during a key period of its operational development, all without a guarantee that DWAC would even complete its IPO or ultimately combine with TMTG, is just not plausible.

Last, DWAC's public filings demonstrate that SPAC A, DWAC, and TMTG were each independently trying to find the best business combination partner for their own respective interests during the Complaint period, even though each considered the other to be one of many options at various times. DWAC's Form S-4 disclosed that between February 2021 and September 2021, TMTG contacted over two dozen SPACs, most of which had no connection to Mr. Orlando. (Ex. D at 165.) When conversations stalled with SPAC A in April 2021, TMTG signed an NDA and began negotiating a potential LOI with SPAC B, but SPAC B ultimately ceased discussions with TMTG. (*Id*.) TMTG also attempted to negotiate a business combination with SPAC C in May 2021. (*Id*.) Mr. Orlando had no involvement with SPAC B or C.

In sum, the SEC fails to articulate a plausible explanation as to why SPAC A, DWAC and TMTG would each spend the requisite time, money, and effort to have extensive negotiations with potential business combination partners, without any intention of potentially merging with these entities, in an attempt to skirt securities regulations if by chance a DWAC/TMTG merger could possibly be achieved and was then investigated. The SEC's theory merely offers "a legal conclusion couched as a factual allegation" and "stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (2009); *see also Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, No. H-15-100, 2015 WL 5825128, at *4 (S.D. Tex. Oct. 6, 2015) (Miller, J.) (finding alleged fraud scheme not plausible and dismissing misrepresentation claims). The claim for scheme liability must be dismissed.

### F.    The SEC Fails to Allege Investor Harm Supporting Disgorgement

Finally, the Complaint fails to allege investor harm, as is required to support its request for disgorgement. Disgorgement is "traditionally considered an equitable remedy" where victims have suffered pecuniary harm; it "generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Liu v. SEC*, 591 U.S. 71, 75, 88 (2020); *SEC v. Govil*, 86 F.4th 89, 98,

103 (2d Cir. 2023) (disgorgement "presupposes pecuniary harm" because funds "cannot be returned if there was no deprivation in the first place"). Allowing "defrauded investors who suffered no pecuniary harm . . . to receive the proceeds of disgorgement" would "confer[] a windfall on those who received the benefit of the bargain." *Id.* In other words, the Court cannot award disgorgement if there is no allegation that purported victims suffered pecuniary harm.

The SEC's allegation that "investors in DWAC would have wanted to know that DWAC was not the 'blank check' company it professed to be" (Compl. ¶ 52) does not assert pecuniary harm adequate to support a claim for disgorgement. *Govil*, 86 F.4th at 105 (opining "'the right to make informed decisions about the dispositions of one's assets' . . . does not result in pecuniary harm" warranting disgorgement) (quoting *Ciminelli v. United States*, 598 U.S. 306, 315 (2023)); *see also SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) (denying request for disgorgement when SEC failed to show pecuniary harm to investors).

"[N]ot to be used punitively," disgorgement generally requires that the SEC "distinguish between legally and illegally obtained profits." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (citation omitted). The SEC must demonstrate that the disgorgement amount is "a reasonable approximation of profits causally connected to the violation." *SEC v. Nielson*, No. 118CV01217EGSGMH, 2020 WL 9439395 (D.D.C. Feb. 13, 2020), *report and recommendation adopted*, No. 118CV01217EGSGMH, 2020 WL 9439363 (D.D.C. July 30, 2020).

The SEC does not plead facts demonstrating that disgorgement is an available remedy in this matter. The Complaint does not allege that Mr. Orlando received any specific illicit trading profits or other ill-gotten gains, making only a passing reference to the purported scheme "allow[ing] him to reap the financial benefit of the DWAC merger." (Compl. ¶ 107.) This

allegation is insufficient to support disgorgement as it provides no specificity regarding what alleged profits the SEC believes were illegally obtained, when they were obtained, or their amount. *See SEC v. Levine*, 517 F. Supp. 2d 121, 129 (D.D.C. 2007), *aff'd*, 279 F. App'x 6 (D.C. Cir. 2008) (acknowledging the SEC's burden to establish "a reasonable approximation of profits causally connected to the violation to establish the amount of disgorgement it may claim"); *see also First City*, 890 F.2d at 1232 (finding that the SEC satisfied its burden after showing the defendant's "actual profits on the tainted transactions"); *see also SEC. v. Miller*, 808 F.3d 623, 637 (2d Cir. 2015) (remanding case and instructing the district court to "rely on specific facts from the record showing receipt of ill-gotten gains" before imposing an asset freeze in furtherance of disgorgement).

The SEC also fails to allege that investors suffered pecuniary harm due to Mr. Orlando's conduct, let alone in the amount the SEC seeks to disgorge. And the SEC will not be able to correct this fatal deficiency. The DWAC/TMTG merger has been highly profitable to any investor who purchased DWAC units at its IPO or soon thereafter.[8] Any DWAC investors who were not

---

[8] In DWAC's May 25, 2021, Form S-1, DWAC units were priced at $10/unit. (*See* Ex. B at 4.) As of January 10, 2025, shares of TMTG traded at $35.31 per share. *See* Google Market Summary: Trump Media & Technology Group Corp. (last visited on Jan. 13, 2025), available at: https://www.google.com/search?q=DJT+stock&sca_esv=4fbe7c869920a6f3&rlz=1C1GCEB_en US1106US1106&ei=QBqFZ4yGNaGGwbkPuLyjqQs&ved=0ahUKEwiMpuHe6_KKAxUhQzA BHTjeKLUQ4dUDCBA&uact=5&oq=DJT+stock&gs_lp=Egxnd3Mtd2l6LXNlcnAiCURKVCB zdG9jazISEAAYgAQYsQMYQxiKBRhGGPoBMg0QABiABBBixAxhDGIoFMggQABiABBix AzIFEAAYgAQyBRAAGIAEMggQABiABBixAzIFEAAYgAQyBRAAGIAEMgUQABiABDI IEAAYgAQYsQMyHhAAGIAEGLEDGEMYigUYRhj6ARiXBRiMBRjdBNgBAUjMF1DjCFj zEnACeAGQAQCYAV-gAcsEqgEBObgBA8gBAPgBAZgCC6AC- QTCAgoQABiwAxjWBBhHwgIXEC4YgAQYsAMYsQMY0QMYgwEYxwEYigXCAhEQAB iABBiwAxixAxiDARiKBcICCxAuGIAEGJECGIoFwgIREC4YgAQYkQIYxwEYigUYrwHCA gsQABiABBixAxiDAcICERAuGIAEGLEDGNEDGIMBGMcBwgIOEC4YgAQYsQMY0QM YxwHCAgUQLhiABMICDhAuGIAEGLEDGIMBGIoFwgIIEC4YgAQYsQPCAhoQLhiABBi RAhiKBRiXBRjcBBjeBBjgBNgBAcICEBAuGIAEGLEDGEMYgwEYigXCAhYQLhiABBix AxjRAxhDGIMBGMcBGIoFwgIKEAAYgAQYQxiKBcICDRAuGIAEGEMY5QQYigXCAh8

interested in the DWAC/TMTG merger were allowed to redeem their shares upon completion of the merger and thus suffered no pecuniary harm. Therefore, the SEC's request for disgorgement should be denied with prejudice.

## V.    THE SEC'S ALLEGATIONS REGARDING ITS SETTLED ADMINISTRATIVE PROCEEDING AGAINST DWAC SHOULD BE STRICKEN PURSUANT TO RULE 12(F)

Should the Court find that any portion of the Complaint survives dismissal, it should, at minimum, strike all references to the SEC's settled administrative proceeding with DWAC. Rule 12(f) allows a court to "strike from a pleading" any "immaterial" matter. *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 457-58 (D.D.C. 1994) (granting motion to strike where the "allegations at issue fail to support plaintiff's legal claims" against defendants and were thus "simply irrelevant"). "Prior settlement agreements, no matter how similar the litigation, are irrelevant" and therefore "should be stricken from the complaint." *Corr. Officers Benevolent Ass'n of Rockland Cnty. v. Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y. 2005) (granting motion to strike paragraphs of a complaint that referred to a "settlement of a prior lawsuit involving similar parties and issues" and the "stipulation of settlement" in the prior case). *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that a complaint resulting in a consent judgment may not be cited in pleading because "a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues . . . cannot be used as evidence in subsequent litigation between that corporation and another party, "can have no possible bearing" on the action, and is thus immaterial to the case).

---

QLhiABBixAxhDGIMBGIoFGJcFGNwEGN4EGN8E2AEBmAMAiAYBkAYKugYGCAEQA
RgUkgcEMTAuMaAH43E&sclient=gws-wiz-serp

The Complaint's reference to the SEC's settlement with DWAC (*see* Compl. ¶ 104) is improper because it was "not the result of an actual adjudication" and is therefore "immaterial, for purposes of Rule 12(f)." *Lipsky*, 551 F.2d at 893-94. Such reference should be stricken. *See id.*; *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 595 (S.D.N.Y. 2011) (striking allegations that reference the defendant's prior settlement with the CFTC); *Dent v. U.S. Tennis Ass'n*, 2008 WL 2483288, at 2 (E.D.N.Y. June 17, 2008) (striking as "immaterial" under Rule 12(f) complaint allegations regarding settlement with state attorney general).

## VI.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety and with prejudice or in the alternative strike paragraphs 11 and 104.

Dated:   February 14, 2025

Respectfully submitted,

By:   */s/ Tamara Droubi*

Tamara Droubi (DC Bar No. 1025088)
tdroubi@vedderprice.com
VEDDER PRICE P.C.
1401 New York Avenue, Suite 500
Washington, DC 20005
T: +1 (202) 312 3320
F: +1 (202) 312 3322

Brooke E. Conner (admitted *pro hac vice*)
bconner@vedderprice.com
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 (312) 609 7500
F:  +1 (312) 609 5005

Adam L. Schwartz (admitted *pro hac vice*)
aschwartz@vedderprice.com
VEDDER PRICE (FL), LLP
600 Brickell Avenue, Suite 1500
Miami, Florida 33131
T: +1 (786) 741 3200
F: +1 (786) 741 3202

Hartley M.K. West (admitted *pro hac vice*)
hartley.west@dechert.com
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, California 94105
T: +1 (415) 262 4511
F: +1 (415) 262 4555

*Counsel for Defendant Patrick Orlando*