UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,

                    v.                                          No. 24-CV-2097 (CRC)

PATRICK ORLANDO,

                                    Defendant.


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
OPPOSITION TO DEFENDANT PATRICK ORLANDO'S RENEWED MOTION
TO DISMISS THE COMPLAINT, OR ALTERNATIVELY STRIKE PORTIONS
OF THE COMPLAINT, AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

I.    STATEMENT OF FACTS ................................................................................... 1

II.   STANDARD OF REVIEW.................................................................................. 8

III.  ARGUMENT ...................................................................................................... 9

A.    Orlando Made False and Misleading Statements and Omitted Facts Necessary in Order
      to Make His Statements Not Misleading. ................................................................. 9

   1.  Orlando Misleadingly Claimed That There Had Been No Substantive Discussions
       With TMTG About a Merger With DWAC. ....................................................... 9

   2.  Orlando Misleadingly Claimed That DWAC Had Not Preselected Any Merger
       Targets........................................................................................................ 11

   3.  Orlando's General Statements About "Pre-Existing Relationships" Were
       Insufficient. ................................................................................................. 13

   4.  Orlando Misleadingly Stated That DWAC Had Not Contacted Any Prospective
       Target Business That SPAC A Had Considered and Rejected. .................................. 14

B.    Orlando's Misrepresentations Were Material. ........................................................... 15

   1.  Statements About DWAC's Potential Business Combinations Were Material............. 15

   2.  The Break-Up Fee Clause Was Material. ........................................................... 20

C.    Orlando Acted With Scienter............................................................................... 21

D.    Orlando Obtained Money and Property as a Result of His Misstatements
      or Omissions. ................................................................................................ 23

E.    Orlando Carried Out a Deceptive Scheme............................................................... 24

   1.  Orlando's Deceptive Conduct Extends Beyond Misrepresentations. ........................... 24

   2.  The SEC's Allegations Are Plausible. ............................................................... 25

F.    The Court Should Not Deny the SEC's Request for Disgorgement Before Discovery
      Has Even Begun............................................................................................. 27

   1.  Orlando's Motion to Deny the SEC's Request for Disgorgement Is Premature. .......... 27

   2.  The SEC Has Properly Alleged a Claim for Disgorgement. ...................................... 28

G.    This Court Should Not Strike the SEC's Allegations Regarding DWAC. ....................... 29

IV.   CONCLUSION ................................................................................................ 30

## **TABLE OF AUTHORITIES**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) .................................................................. 21

*Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1 (D.D.C. 2019) ........................... 8

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .......................................... 16, 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 8

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*,
436 F. Supp. 3d 354 (D.D.C. 2020) .................................................................. 8

*de Csepel v. Republic of Hungary*, 714 F.3d 607 (D.C. Cir. 2013) ........... 8, 22

*Dolphin & Bradbury v. SEC*, 512 F.3d 634 (D.C. Cir. 2008) ...................... 21

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...................................... 21

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000) .......................................... 19

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004). ....................................... 23

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3rd Cir. 1997) ................. 17

*Kapur v. USANA Health Sci., Inc.*,
No. 2:07-CV-00177, 2008 WL 2901705 (D. Utah July 23, 2008) ............... 13

*Karth v. Keryx Biopharm., Inc.*,
No. 16-cv-11745, 2018 WL 3518497 (D. Mass. July 19, 2018) ................... 13

*Liu v. SEC*, 591 U.S. 71 (2020) .................................................................... 28

*Macquarie Infr. Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024) .......... 13

*Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46 (D.D.C. 2010) ............ 30

*Oran v. Stafford*, 226 F.3d 275 (3rd Cir. 2000) .......................................... 17

*Pilkin v. Sony Interactive Entertainment LLC*,
No. 17-cv-02501-RDM, 2021 WL 2451299 (D.C. Cir. Mar. 19, 2021) .......... 30

*Rockies Fund, Inc. v. SEC*, 428 F.3d 1088 (D.C. Cir. 2005) ........................................ 16

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987) ........................................ 13

*SEC v RPM Int'l, Inc.*, 282 F. Supp. 3d. 1 (D.D.C. 2017) ........................................ 16, 23

*SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20 (D.D.C. 2024) ........................................ 9, 24

*SEC v. Conrad*, 354 F. Supp. 3d 1330 (N.D. Ga. 2019) ........................................ 20

*SEC v. Crystal World Holdings, Inc.*,
No. 19-cv-02490, 2025 WL 326593 (D.D.C. Jan. 28, 2025) ........................................ 28

*SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306 (D.D.C. 2014) ........................................ 21

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) ........................................ 27

*SEC v. Kokorich*, 663 F. Supp. 3d 63 (D.D.C. 2023) ........................................ 9

*SEC v. Levin*, 517 F. Supp. 2d 121 (D.D.C. 2007) ........................................ 28

*SEC v. Miller*, 808 F.3d 623 (2d Cir. 2015) ........................................ 28

*SEC v. Navellier & Assocs.*,
108 F.4th 19 (1st Cir. 2024), *cert. denied*, 2025 WL 1603606 (2025) ........................................ 28

*SEC v. Nielson*, No. 18-cv-1217, 2020 WL 9439395 (D.D.C. Feb. 13, 2020) ........................................ 28

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ........................................ 21

*SEC v. Westport Cap. Mkts. LLC*,
No. 3:17-cv-2064, 2019 WL 4857337 (S.D.N.Y. Sept. 30, 2019) ........................................ 27

*Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416 (D.R.I. 1996) ........................................ 14

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000) ........................................ 8

*Sprint Nextel Corp. v. FCC*, 508 F.3d 1129 (D.C. Cir. 2007) ........................................ 15

*Sterling Drug Inc. v. FTC*, 450 F.2d 698 (D.C. Cir. 1971) ........................................ 15

*Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240 (4th Cir. 1988) ........................................ 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................................... 21

*U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542 (D.C. Cir. 2002) ....................................... 9

*Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457 (D.D.C. 1994) .................................................. 30

*Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009) ....................................................................... 28

**Statutes**

15 U.S.C. § 77q(a)(3) ...................................................................................................................... 24

15 U.S.C. §§ 77q(a)(1) .................................................................................................................... 24

17 C.F.R. § 240.10b-5(b) ............................................................................................................... 24

## INTRODUCTION

Defendant Patrick Orlando repeatedly misled investors and the market as part of a fraudulent scheme to take Digital World Acquisition Corp. ("DWAC") public and acquire Trump Media & Technology Group Corp. ("TMTG").[1] Orlando, as CEO and Chairman of DWAC (a special purpose acquisition company, or "SPAC"), signed public filings falsely representing that DWAC did not intend to acquire any specific company and had had no discussions or contacts with any potential acquisition targets. These public filings misleadingly omitted the fact that Orlando and DWAC had targeted TMTG for months, and that Orlando agreed to pay a million-dollar break-up fee to TMTG if he did not consummate an acquisition. By using DWAC to acquire TMTG, rather than a different SPAC company that he also controlled ("SPAC A"), Orlando reaped tens of millions of dollars in additional profits. For more than a month after DWAC's IPO, while this truth was hidden from the public, investors bought and sold DWAC shares at approximately $10 per share. Then, when Orlando finally revealed DWAC's true plans, DWAC's stock price exploded, rising over 400% in a single day. This is classic securities fraud. The Court should deny Orlando's motion to dismiss the Complaint.

## I.    STATEMENT OF FACTS

There was a wide gulf between Orlando and DWAC's public statements and private reality at the time of DWAC's IPO in September 2021. DWAC's public filings, which Orlando signed, said it was like other SPACs, with no underlying business operations and a single purpose: to locate and acquire an as-yet unidentified private operating company. (*See* Compl. ¶¶ 19, 21, 86-88.) The filings pointed to the experience and purported expertise of its management team, led by Orlando, as selling points for investors. (*Id.* ¶¶ 19-20; Def. Ex. B at

---

[1] TMTG is sometimes referred to as "TMG" in documents quoted in the Complaint.

12.) Orlando also affirmed that DWAC's efforts had been "limited to organizational activities," that DWAC had "not selected any specific business combination target," and that neither DWAC nor anyone on its behalf had "engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us." (*Id.* ¶ 86.) As a result, Orlando and DWAC said, there was "no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination." (*Id.* ¶ 87.) None of this was true. Privately, Orlando had planned for DWAC to merge with TMTG since at least April 2021.

Within days of TMTG's founding in February 2021, a representative of the company approached Orlando about acquiring TMTG and taking it public. (*Id.* ¶¶ 31-32.) Soon thereafter, Orlando (under the auspices of his company, SPAC A, which had already had an IPO) and TMTG signed a non-exclusive letter of intent to explore a possible merger between the companies. (*Id.* ¶ 33.) The letter expired on April 5, 2021 (*id.*), without a merger taking place. Among other issues, several of SPAC A's directors and one of its corporate officers opposed a merger with TMTG.[2] (*Id.* ¶ 34.)

On or about April 8, 2021, Orlando began pursuing two alternative paths to a merger with TMTG. (*Id.* ¶ 35.) He referred to these as "Plan A," through which he planned to find a way to merge SPAC A with TMTG, and "Plan B," through which he would find an alternative SPAC to

---

[2] Orlando suggests that one of the reasons SPAC A did not sign a mutually exclusive letter of intent with TMTG was that "TMTG needed to undertake additional work." (Def. Mot. at 5.) As support, he cites to page 166 of a document he attaches as Exhibit D to his Motion. Page 166 of that document does not state that TMTG's need for "additional work" was the reason SPAC A declined to sign an exclusive letter. In any event, even if the cited document did support Orlando's proposition, the reasons for the breakdown between TMTG and SPAC A in April 2021 would be an issue for fact discovery, and not appropriate for resolution based on the pleadings.

merge with TMTG. (*Id.* ¶¶ 36-37.) On April 9, 2021, a representative of an investment bank with ties to DWAC proposed to Orlando, "DWAC could be a solution" for TMTG. (*Id.* ¶ 38.) On April 14, Orlando met with representatives of TMTG, told them that SPAC A was not available, and suggested "Plan B." (*Id.* ¶ 39.)

Ten days later, Orlando learned he could obtain control over DWAC, which had not yet had its IPO. (Compl. ¶ 44.) On April 28, Orlando signed a letter of intent under which he would obtain 90% ownership of DWAC's sponsor.[3] (*Id.*) The next day, he met with TMTG representatives and continued merger discussions. On May 4, Orlando received a letter of intent from TMTG's counsel that contemplated a merger between SPAC A and TMTG. (*Id.* ¶ 46.)

On May 8, Orlando exchanged messages about TMTG with representatives of the investment bank that had connected him with DWAC. (Compl. ¶ 47.) Orlando shared with the group different merger scenarios involving TMTG and noted that the "optimal combination" was clearly DWAC and TMTG. (*Id.*) Another individual agreed but noted that they needed "enough time to get DWAC" to the market. (*Id.*) On May 14, Orlando obtained a 90% ownership interest in DWAC's sponsor and was appointed the CEO and Chairman of DWAC. (*Id.* ¶ 48.)

On May 25, DWAC filed its initial Form S-1 with the SEC ("May Form S-1"). (Compl. ¶ 49.) Orlando reviewed and signed this filing. (*Id.*) The May Form S-1 stated that DWAC had not identified any specific business combination targets and had not engaged in any substantive discussions with any business combination targets. (*Id.* ¶ 51.) It also stated that DWAC had added two new directors to its Board. (*Id.* ¶ 49.) Both of these new directors were SPAC A

---

[3] A SPAC sponsor is the management team primarily responsible for establishing and launching the SPAC. (Compl. ¶ 18.)

directors who had been supportive of a merger with TMTG. (*Id.*) Neither of the SPAC A directors who had opposed a merger with TMTG joined DWAC. (*Id.* ¶ 50.)

Five days later, on May 30, Orlando and several individuals affiliated with DWAC met with one of TMTG's founders and its external counsel. (Compl. ¶ 55.) The attendees called DWAC's CFO from the meeting in a recorded video. (*Id.*) During the call, Orlando thanked everyone for figuring out "how to get this done," and the TMTG founder thanked a DWAC executive and said the DWAC executive would be a "big part of this." (*Id.*) The next day, another individual reported that Orlando was "officially moving forward" with the TMTG deal. (*Id.* ¶ 56.) Orlando wrote that there was no TMTG SPAC but added that he had a "great relationship" with TMTG and that he had "extremely high confidence" that TMTG would end up at "one of my SPACs." (*Id.*) Orlando closed by noting that he would "explain in person." (*Id.*) This follow-up conversation was not preserved or recorded. On June 1, Orlando told an individual who was a director of both SPAC A and DWAC that he wanted "Trump to meet the SPAC A AND DWAC team." (*Id.* ¶ 58.)

On June 4, Orlando and TMTG signed a unilaterally exclusive letter of intent between SPAC A and TMTG. (Compl. ¶ 60.) In other words, it locked in TMTG with SPAC A but allowed SPAC A to also pursue other targets. This letter made Orlando personally liable for a $1 million fee if SPAC A and TMTG did not enter an acquisition agreement by August 6. (*Id.* ¶ 61.) Crucially, however, the letter made Orlando exempt if he proposed an acceptable "alternative" SPAC to TMTG. (*Id.*)

Despite the letter of intent between SPAC A and TMTG, Orlando continued to plan the DWAC-TMTG merger. On June 7, in response to a text message from a DWAC and SPAC A director stating that Orlando was using SPAC A to "grab the deal knowing you are going to

move it" and (correctly) pointing out that moving the deal would allow Orlando to "make more money," Orlando responded that "DWAC is better and will make the project . . . more successful." (Compl. ¶¶ 63-64.) That same day, Orlando sent a message to another colleague urging him to "make DWAC great" and promising to give "[T]rump . . . a DWAC" tombstone[4] "THE SIZE OF A GOLF CART!!" (*Id.* ¶ 65.) On June 8, Orlando texted other colleagues a picture from the June 4 TMTG letter of intent signing, writing, "Let's make it DWAC," and "earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there" and push SPAC A to a different target. (*Id.* ¶ 66.) On June 9, Orlando sent a DWAC representative an analysis modeling the value of DWAC shares if DWAC merged with TMTG. (*Id.* ¶ 68.)

Contrary to the disclosures in the Forms S-1 and Form S-4 (*see infra* at 6-7), Orlando and TMTG representatives discussed merging TMTG with DWAC throughout the spring and summer of 2021. (Compl. ¶ 71.) Orlando and DWAC's in-house counsel had more than 100 phone calls with TMTG's representatives and outside counsel between May 25 and September 2. (*Id.* ¶ 74.) Orlando also spoke with TMTG's outside counsel during the summer of 2021 about using DWAC to complete a merger with TMTG. (*Id.* ¶ 74.) This same outside counsel was copied on e-mails from a DWAC investor to prospective investors promising that potential investors could participate in "a call with Patrick's team" and the TMTG outside counsel on "the possible SPAC acquisition to understand the uniqueness of this possible opportunity." (*Id.* ¶ 77.) And on July 15, a TMTG executive recorded himself stating "TMTG ticker symbol . . . The merger agreement arrived. Also potentially flipping it to another SPAC." (*Id.* ¶ 82.) On August 11, a DWAC director messaged DWAC's CFO confirming a meeting between TMTG and

---

[4] A "tombstone" is a financial term referring to a notice used to formally announce a transaction. (Compl. ¶ 65.)

DWAC after DWAC's September IPO. (*Id.* ¶ 83.) On August 18, a TMTG representative e-mailed himself, writing "Everything is lined up. Platform is weeks away. Backed by $300 million in cash." (*Id.* ¶ 84.) At that time, SPAC A had just $115 million in its trust account; DWAC, on the other hand, had announced a $300 million IPO. (*Id.*) On August 28, Orlando received this text from a DWAC representative: "TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement. I told them we'd need a month. Probably gonna settle at 2-3 weeks." (*Id.* ¶ 85.)

During DWAC's IPO, which began September 3, 2021, and closed on September 8, DWAC shares sold at $10.00 per unit, raising approximately $287.5 million. (Compl. ¶ 91.) On the day its IPO closed, DWAC sent TMTG (and several other companies) a draft nondisclosure agreement. (*Id.* ¶ 93.) On September 14, TMTG's outside counsel sent DWAC a draft letter of intent that would be mutually exclusive. (*Id.*) The next day, DWAC began coordinating an in-person event to sign the letter. (*Id.*) On September 22, only two weeks after the IPO closed, DWAC formally approved signing the letter of intent and Orlando signed a separate agreement terminating the June 4 letter between TMTG and SPAC A, which released him from the $1 million break-up fee. (*Id.* ¶ 100.) This letter was backdated to be effective as of September 1, 2021. (*Id.*) DWAC publicly announced the merger with TMTG via a Form 8-K that became publicly available on October 21. (*Id.* ¶ 101.) DWAC stock increased in value from $9.96 at the close of trading on October 20 to $45.50 at the close of trading on October 21. (*Id.* ¶ 102.)

Throughout 2021, Orlando made numerous material misrepresentations in DWAC's public filings. Specifically:

> May Form S-1: "We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us." (Compl. ¶ 51.)

July Form S-1 ("July Form S-1"): "We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us." (*See id.* ¶ 79.)

August Form S-1 ("Final Form S-1"): "We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us." (*Id.* ¶ 86.)

"We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors, or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. . . . Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination." (*Id.* ¶ 87.)

"We have not contacted any of the prospective target businesses that [SPAC A] . . . had considered and rejected. We do not currently intend to contact any of such targets . . . ." (*Id.* ¶ 88.)

Additionally, in May 2022, DWAC and Orlando filed a Form S-4 regarding the planned merger with TMTG that disclosed that the June 4 letter of intent between SPAC A and TMTG was terminated effective September 1, 2021, but failed to disclose that the agreement was signed on September 22, and that Orlando was released from the break-up fee clause on that date. (Compl. ¶ 103.) The Form S-4 also failed to disclose any of the interactions between Orlando, DWAC, and TMTG before September 8, 2021, and failed to disclose that Orlando had planned for DWAC to merge with TMTG prior to DWAC's IPO. (*Id.*)

On July 23, 2023, the SEC instituted a settled cease-and-desist proceeding against DWAC based on the events described above, finding that DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing a civil penalty of $18 million. On November 23, 2023, DWAC filed an amended Form S-4 incorporating many of the SEC's findings and describing

much of the conduct alleged in the SEC's Complaint in this matter. (*See* Ex. A at 186/510-192/510.) On July 17, 2024, the SEC filed the instant Complaint, alleging that Orlando violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act. (ECF No. 1.) Defendant Orlando moved to dismiss the Complaint on February 14, 2025. (ECF No. 17.) After the Court struck this motion without prejudice on July 1, Defendant Orlando filed a revised motion to dismiss on August 4, 2025. (ECF No. 28.)

## II.    <u>STANDARD OF REVIEW</u>

A complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In ruling on Orlando's motion to dismiss, the Court must "treat the complaint's factual allegations as true" and "must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation modified). The Court must "construe a complaint liberally in the plaintiff's favor," *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 436 F. Supp. 3d 354, 358 (D.D.C. 2020) (citation modified), and should not resolve "fact-intensive issues." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 607 (D.C. Cir. 2013). At this stage, the Court "may only consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 7 (D.D.C. 2019) (Cooper, J.) (citation modified).

Although Federal Rule of Civil Procedure 9(b) requires that plaintiffs "state with particularity the circumstances constituting fraud or mistake," the rule "specifically allows allegations of intent, knowledge, and other condition of mind to be averred generally." *SEC v.*

*Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 36-37 (D.D.C. 2024) (citation modified) (quoting

*U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002)).

III.    **ARGUMENT**

    A.  Orlando Made False and Misleading Statements and Omitted Facts Necessary in Order to Make His Statements Not Misleading.

        1.  Orlando Misleadingly Claimed That There Had Been No Substantive Discussions With TMTG About a Merger With DWAC.

Orlando signed filings (namely, the May Form S-1, the July Form S-1, the Final Form S-1 (in September), and the Form S-4) that were misleading because they falsely claimed that DWAC had had no substantive pre-IPO discussions with any potential targets about a merger despite communicating with TMTG about a possible merger since April 2021.[5] "Rule 10b-5 and Section 17(a) both establish that a defendant has a duty to speak if he made statements that, without more information, would be misleading to investors." *SEC v. Kokorich*, 663 F. Supp. 3d 63, 77-78 (D.D.C. 2023). Here, the bald statement that DWAC had had no substantive discussions with potential targets was false and misleading because DWAC had, in fact, had substantive discussions with TMTG. Moreover, this statement omitted the truth about the conversations and negotiations between Orlando and TMTG, falsely suggesting that DWAC was a "blank check" company.

The SEC alleges that, prior to the May Form S-1 filing, Orlando began exploring "Plan B" (specifically, on or about April 8, 2021), and that on April 9, he was told that DWAC could be a solution for TMTG. (Compl. ¶¶ 35, 38.) On April 14, Orlando suggested to TMTG

_____

[5] Orlando claims that the SEC has "[s]pecifically" alleged a number of statements in the Form S-4 relating to TMTG's conversations with SPAC A to be false and misleading. (Def. Mot. at 15-16.) The SEC's Complaint alleges nothing of the kind. (*See* Compl. ¶ 103.) It alleges that the Form S-4 is misleading because it omits the interactions between DWAC and TMTG, not because its description of TMTG's negotiations with SPAC A is false.

representatives that there could be a "Plan B" alternative to a merger with SPAC A. (*Id.* ¶ 39.) TMTG representatives specifically mentioned the existence of "Plan B" in internal communications on May 2. (*Id.* ¶ 45.) The proposed letter of intent between TMTG and SPAC A provided to Orlando on May 4 allowed Orlando to avoid paying a million-dollar break-up fee if he provided TMTG with an "alternative" SPAC. On May 8, Orlando wrote that the "optimal" combination was for DWAC to merge with TMTG. (Compl. ¶ 47.) Finally, as part of the May Form S-1, he announced that two SPAC A directors (who had supported a TMTG merger) were joining the DWAC board. Thus, the SEC has clearly alleged that Orlando had substantive discussions with TMTG about a merger with an alternative SPAC in April and May 2021, prior to the filing of the May Form S-1.

Whether or not Orlando specifically referred to "DWAC" in a conversation with TMTG (Def. Mot. at 16), the SEC has clearly alleged that Orlando had substantive discussions with TMTG about a "Plan B" merger partner, that Orlando specifically envisioned DWAC to be "Plan B"[6] and that he took steps to ensure DWAC's leadership was supportive of "Plan B." His statement in the May Form S-1 (and in subsequent versions of the Form S-1) denying any history of substantive discussions with potential targets is, therefore, misleading.

After the May Form S-1 filing and before the July and Final Form S-1 filings, TMTG and Orlando continued to have substantive discussions about a merger with DWAC. Specifically:

(1) Orlando met with a TMTG founder and TMTG external counsel on May 30. During that meeting, the participants called a DWAC executive who had no role with SPAC A. The TMTG representative told the DWAC executive that he would be a "big part

---

[6] That Orlando did not formally assume control of DWAC until May 14 (Def. Mot. at 16) is irrelevant because he made plans to pursue TMTG with DWAC long before that.

of this" and Orlando thanked the meeting's attendees for figuring out "how to get this done." (Compl. ¶ 55.)

(2) Orlando and DWAC's in-house counsel spoke with TMTG representatives and outside counsel more than 100 times between May 25 and September 2. (*Id.* ¶ 74.)

(3) TMTG's outside counsel was aware in the summer of 2021 that DWAC specifically was a possible vehicle for a merger with TMTG. (*Id.* ¶¶ 74, 76.)

(4) On July 15, a TMTG executive noted that the "merger agreement arrived. Also potentially flipping it to another SPAC." (*Id.* ¶ 82.)

(5) On August 11, a DWAC director confirmed a meeting between DWAC and TMTG was set for after the DWAC IPO in September. (*Id.* ¶ 83.)

(6) On August 18, a TMTG executive noted that "everything" was "lined up" for TMTG, including "$300 million in cash" – the exact amount DWAC had announced it planned to raise in its IPO. (*Id.* ¶ 84.)

In light of these facts, Orlando's July and September 2021 statements in the Forms S-1 that DWAC had not had substantive discussions with TMTG about a merger were misleading.

> ### 2. Orlando Misleadingly Claimed That DWAC Had Not Preselected Any Merger Targets.

The SEC has also sufficiently alleged that DWAC had selected TMTG as a target for combination and that, therefore, Orlando's statements to the contrary in the Forms S-1 were misleading.[7] Among other things, the SEC alleges that on June 7, in response to a text message from a DWAC and SPAC A director stating that Orlando was using SPAC A to "grab the deal

---

[7] Orlando suggests that the SEC alleged that "DWAC determined pre-IPO that it would combine with TMTG." (Def. Mot. at 17.) But the SEC never alleged that Orlando and DWAC "determined" it "would combine" with TMTG – all that the SEC alleged was that, contrary to Orlando's public statements, DWAC had "selected" a "target." (Compl. ¶¶ 86; 89.)

knowing you are going to move it" and (correctly) pointing out that moving the deal would allow Orlando to "make more money," Orlando responded that "DWAC is better and will make the project . . . more successful." (Compl. ¶¶ 63-64.) That same day, Orlando sent a message to another colleague urging him to "make DWAC great" and promising to give "[T]rump . . . a DWAC" tombstone "THE SIZE OF A GOLF CART!!" (*Id.* ¶ 65.) On June 8, Orlando sent other colleagues a picture from the June 4 TMTG letter of intent signing, stating "Let's make it DWAC" and "earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there" and push SPAC A to a different target. (*Id.* ¶ 66.) And on June 9, Orlando sent a DWAC representative an analysis modeling the value of DWAC shares if DWAC merged with TMTG. (*Id.* ¶ 68.) Other communications from the summer of 2021 further suggest that DWAC had selected TMTG as a target. (*See, e.g.*, *id.* ¶¶ 77 (DWAC investor promising call with TMTG outside counsel to other prospective DWAC investors), 80 (DWAC director messaged DWAC's CFO urging him to make history with DWAC and TMTG), 85 (message to Orlando from DWAC representative regarding announcing Plan B with TMTG).)

The allegations Orlando cites in his defense, such as his disclaimer to a DWAC fundraiser that there was "no TM[T]G SPAC," are unavailing. (Def. Mot. at 17 (quoting Compl. ¶ 56).) Viewed in the light most favorable to the SEC, Orlando's statement that he "believe[d] with extremely high confidence" that TMTG would end up with "one of my SPACs," and his request to "explain in person," rather than in writing that could be preserved, supports the SEC's allegations. (Compl. ¶ 56.) It is reasonable to infer that Orlando was reluctant to put into writing the reasons he was confident that TMTG would end up with one of his SPACs because he understood that he was not permitted to negotiate with TMTG on behalf of DWAC, pre-IPO. (*See id.* ¶ 40.) Thus, this statement is entirely consistent with the SEC's allegations.

    3.   Orlando's General Statements About "Pre-Existing Relationships" Were Insufficient.

Orlando suggests that his consistently misleading disclosures about DWAC were cured by a handful of statements informing investors that DWAC would rely on an "established deal sourcing network" and "quality deal pipeline," as well as the "wide network" of contacts that were a "source of acquisition opportunities." (Def. Mot. at 17-19.) But Orlando's disclosures about DWAC were misleading because they omitted the crucial truth: Orlando had already had substantive conversations with TMTG about a merger and had targeted TMTG for merger with DWAC. Indeed, Orlando's argument proves too much. Orlando wanted to publicize his "deal sourcing network" because he knew that investors cared about his ability to find a good merger partner for DWAC. The fact that Orlando had already identified that merger partner and, more, that he had had substantive discussions with that merger partner made other "acquisition opportunities" or "deal flow relationships" *less relevant*. Thus, his references to a "sourcing network" were half-truths (at best) that omitted information necessary to not be misleading.

Orlando follows an unconvincing pattern: suggesting (without legal support) that it was acceptable to make incomplete disclosures and mislead investors with half-truths because he had spoken generally about his "quality deal pipeline." (Def. Mot. at 17-18.) But when "a corporation does make a disclosure — whether it be voluntary or required — there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (citation omitted); *see also Macquarie Infr. Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) ("Rule 10b-5(b) requires disclosure of information necessary to ensure that statements already made are clear and complete"); *Karth v. Keryx Biopharms., Inc.*, No. 16-cv-11745, 2018 WL 3518497, at *4 (D. Mass. July 19, 2018); *Kapur v. USANA Health Scis, Inc.*, No. 2:07-CV-00177, 2008 WL 2901705, at *13 (D. Utah July 23, 2008) ("because . . . Defendants chose to

reveal the source of their financial success, they had a duty under the law to ensure that the revelation was complete and accurate"). A similar duty exists "where a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 424 (D.R.I. 1996). Orlando's generalized optimism about his deal pipeline did not make his fraudulent disclosures about DWAC's lack of prior interactions with potential targets clear, complete, or accurate. In other words, Orlando explicitly stated that DWAC had no conversations with potential merger targets about a merger and that it had not selected a business combination target. These statements were incomplete and therefore misleading because they omitted any mention of his actual conversations with an actual merger target: TMTG.

   4. Orlando Misleadingly Stated That DWAC Had Not Contacted Any
     Prospective Target Business That SPAC A Had Considered and Rejected.

  Orlando also argues that because SPAC A had not formally "rejected" TMTG as a target business and because TMTG had entered into several letters of intent with SPAC A, his statement that DWAC had not contacted any prospective target considered and rejected by SPAC A was technically true. (Def. Mot. at 19.) But the SEC alleges that "discussions between SPAC A and TMTG had ceased before DWAC's IPO." (Compl. ¶ 89.) More specifically, the SEC alleges that two directors and an officer of SPAC A opposed pursuing a merger with TMTG (*id.* ¶ 34), and that other SPAC A directors who were in favor of a TMTG merger had been brought on at DWAC. (*Id.* ¶ 49.) There is no allegation that the SPAC A directors and officer opposing a merger with TMTG ever left the company or changed their minds about the merger. The SEC further alleges that Orlando's communications with his investment bank about SPAC A during Summer 2021 "predominantly related to SPAC A's evaluation of other acquisition targets." (*Id.* ¶ 70.) And the record is replete with allegations that Orlando, the CEO and Chairman of SPAC

A, intended to move TMTG to DWAC. (*See, e.g.*, *id.* ¶¶ 63, 65, 66, 69.) The SEC has alleged more than sufficient facts to show that, even if SPAC A had not taken a formal vote to "reject" TMTG as a target, the leaders of SPAC A had turned away from TMTG and were looking elsewhere. In light of these allegations, Orlando's statements that DWAC had not contacted any prospective target business considered and rejected by SPAC A were false and misleading.

    B.  <u>Orlando's Misrepresentations Were Material.</u>

        1.  Statements About DWAC's Potential Business Combinations Were Material.

Orlando's misstatements about DWAC's preselection of and conversations with TMTG were material, as evidenced by the market's dramatic reaction to the news that DWAC and TMTG planned to merge. The fundamental purpose of a SPAC is to identify a private company for acquisition and to acquire it, and reasonable investors would find this information important.[8] Contrary to Orlando's arguments, he had taken concrete steps toward a merger between DWAC and TMTG prior to making the false statements at issue. Orlando's repeated, specific, and false claims that DWAC had not preselected a merger target and had had no substantive conversations with any potential targets further illustrate that these facts were material. (Compl. ¶¶ 19, 21.)

A fact is material where there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" or if the fact would "significantly alter[] the

---

[8] Orlando's reliance on Commissioner Uyeda's December 12, 2024 dissenting statement (Def. Mot. at 1-2, 20-21) is misplaced. (Commissioner Uyeda was Acting Chairman of the SEC from Jan.-April 2025.) The SEC itself is the plaintiff in this matter, not individual Commissioners, so Commissioner Uyeda's comments are not statements by a party opponent, nor do they have the force of law. *Cf. Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007) (deadlocked vote was not agency action because votes were "actions of the individual Commissioners, not the Commission"); *see also Sterling Drug Inc. v. FTC*, 450 F.2d 698, 707-08 (D.C. Cir. 1971) (declining to require disclosure of memoranda written by individual Commissioners because the "two memoranda at issue may provide only the individual Commissioner's reasons for approving the decisions, *not the reasons of the Commission as a whole*") (emphasis added).

'total mix' of information." *Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1096 (D.C. Cir. 2005)

(quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Materiality "is a mixed question

of law and fact," and therefore "courts have cautioned against granting a motion to dismiss based

on the failure to plead materiality unless the information is so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance."

*SEC v RPM Int'l, Inc.*, 282 F. Supp. 3d. 1, 23 (D.D.C. 2017) (citation modified). Orlando comes

nowhere close to that threshold; indeed, the SEC's allegations firmly establish that reasonable

shareholders would (and did) find Orlando's misstatements material.

Orlando's suggestion that "preliminary" merger discussions cannot be material is wrong.

(Def. Mot. at 20-21.) The Supreme Court has held that "[w]hether merger discussions in any

particular case are material therefore depends on the facts," and "materiality depends on the

significance the reasonable investor would place on the withheld or misrepresented information."

*Basic Inc.*, 485 U.S. at 238-40. A SPAC has no underlying business operation and exists to find

an acquisition target and complete a business combination. (Compl. ¶¶ 19-20.) Thus, the

concrete steps DWAC took, pre-IPO, toward identifying and combining with TMTG would have

been highly significant to reasonable investors. By concealing DWAC's identification of TMTG

as a target and the ongoing conversations with TMTG, Orlando misleadingly suggested that

DWAC was a standard "blank check" company with potential upside because of his own

supposed business acumen. In reality, Orlando had had multiple substantive discussions with

TMTG about a merger, had already arranged for TMTG supporters to join the DWAC board, and

had tied TMTG to SPAC A for months, preventing it from finding another alternative. The

preselection of and conversations with TMTG were material.

This is not some *post hoc* hypothetical. Investors clearly placed enormous significance on the fact that DWAC intended to merge with TMTG. Although it is not always an appropriate yardstick, when a stock is "traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282 (3rd Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3rd Cir. 1997)). Here, the price of DWAC stock hovered around $10 a share for almost a month after the IPO, then shot up by more than 400% in a single day when DWAC disclosed its merger agreement with TMTG. It is difficult to imagine a more dramatic illustration of the importance of this information.

Orlando refers to *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427, arguing that its "holding" is that "preliminary discussions are not material" without "concrete steps towards a merger." (Def. Mot. at 20.) Undersigned counsel could not locate the supposed "holding" to which Orlando refers, either at the provided pin cite or anywhere else in the case, which does not involve a merger. To the extent *Burlington* even discusses the concept of a merger, it (in a separate part of the opinion) emphasizes that if a company announces a "fundamental change in the course the company is likely to take, there may be room to read in an implicit representation by the company that it will update the public with news of any radical change in the company's plans — *e.g.*, news that the merger is no longer likely to take place." *Id.* at 1434. Here, the issue is not that Orlando failed to update the market when DWAC identified a merger target. Rather, it is that Orlando materially misled investors by saying DWAC had not identified a target and had not held substantive discussions with a target when neither of those things were true.

*Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240 (4th Cir. 1988), is similarly of no help to Orlando. That case first noted that "silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* at 243 (quoting *Basic Inc.*, 485 U.S. at 239 n.17). There, plaintiffs "failed to identify any statement made misleading by the defendants' nondisclosure of their merger discussions"; the court noted, in particular, that there was "no allegation" that the defendants "had previously denied the possibility of a merger." *Id.* at 244. Here, the opposite is true: the SEC has alleged and pointed the Court to specific statements made by Orlando denying any contact with potential targets and any preselection of potential targets. The *Taylor* court then went on to observe that the "materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished." *Id.* at 244. It qualified, however, that the fact that merger discussions were "preliminary, contingent, and speculative" was "not dispositive" of the question of materiality and acknowledged the "unique significance" of mergers to a company. *Id.* Legally, *Taylor* does not support Orlando's position.

*Taylor* is also factually distinguishable from this matter. The company at issue in that case was a bank holding company, with ongoing operations in South Carolina. *Id.* at 242. The merger at issue in *Taylor* would have been illegal at the time of the alleged omission; it took a Supreme Court decision to make it feasible. *Id.* at 244. DWAC, by contrast, was a SPAC with no purpose other than to identify and merge with a target; few things could be more significant to a SPAC investor than the identity of the SPAC's target or targets, as well as whether substantive discussions between the SPAC and its target had occurred. Finally, as alleged and as described *supra*, the conversations between Orlando and TMTG went far beyond "preliminary, contingent, and speculative" discussions. Orlando obtained a letter of intent between TMTG and SPAC A that prevented TMTG from pursuing alternative SPACs and essentially held TMTG in place

until DWAC could IPO. Further, Orlando placed pro-TMTG directors on DWAC's board who would be supportive of a merger. Thus, the DWAC/TMTG merger and the steps taken toward that merger were more significant than the merger at issue in *Taylor*.

Orlando suggests that the "redemption rights" provided to DWAC investors are "extraordinary protection" for DWAC investors, which prevent DWAC's business combination discussions from being material. (Def. Mot. at 21.) Orlando does not explain why a right of redemption would in any way affect the materiality of a company's misstatements and cites no cases, statutes, or rules that would assist the Court in factoring a right of redemption into its analysis. Indeed, a right of redemption (or similar protection for investors) is particularly irrelevant in a securities fraud case brought by the SEC, which is not required to prove actual harm to investors. *See Graham v. SEC*, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000). Even if the Court were to consider this as part of its materiality analysis, which it should not, Orlando forgets that the right of redemption only protects stockholders; left unprotected are those investors who rely on the truthfulness of the company's disclosures in *selling* their shares for less than they are worth. *See infra* Part (III)(F)(2). The right of redemption is irrelevant to the Court's analysis here.

Orlando offers up several red herrings, suggesting that there is no law, rule, or regulation prohibiting pre-IPO discussions with potential targets, noting that "industry practice" is not to disclose letters of intent between a SPAC and targets in Forms 8-K (Def. Mot. at 21-22) and arguing that letters of intent are generally not material. (*Id.* at 2.) But the SEC has not alleged that pre-IPO discussions are inherently deceptive or otherwise prohibited, that all letters of intent must be disclosed, or that Orlando should have immediately disclosed the letter of intent signed

with TMTG after DWAC's IPO. What it has alleged is that Orlando made flatly untrue and misleading statements about DWAC in its Forms S-1 and Form S-4.

Accepting the SEC's allegations as true and drawing all inferences in its favor, the Court should not find that, as a matter of law, DWAC's preselection of TMTG was immaterial.

### 2. The Break-Up Fee Clause Was Material.

A reasonable shareholder would have considered Orlando's potential exposure to a $1 million fee if he failed to secure a merger with TMTG important. As Orlando himself acknowledges, he and DWAC made statements in their public disclosures about their "deal sourcing network," and "quality deal pipeline," as well as his "wide network of professional services contacts and business relationships." (Def. Mot. at 17-19.) They further relied on Orlando's own "professional experience and business relationships." (*Id.*) Through "repeated invocations" of his own skill, expertise, and connections, Orlando "created a duty to disclose" the truth: that he had a powerful incentive to bring TMTG and DWAC together that made his "deal sourcing" and "pipeline" less relevant. *See SEC v. Conrad*, 354 F. Supp. 3d 1330, 1345-46 (N.D. Ga. 2019) (granting summary judgment in part, where repeated reference to defendant's experience created a duty to disclose his disciplinary history). By putting his own judgment and business acumen squarely at issue, Orlando had a duty to disclose material facts — like a potential $1 million break-up fee — that could affect his judgment in evaluating DWAC's potential targets.

Orlando suggests that the break-up fee is irrelevant as a matter of law because there were "multiple exceptions" that made it 'highly unlikely' he would ever owe it. (Def. Mot. at 22.) Orlando does not explain how the existence of exceptions to a contract provision makes that provision irrelevant. Nor does he cite any law to support his novel argument. He fails to provide

anything more than a bare assertion that the exceptions were "broad" and made it "highly unlikely" Orlando would owe anything. At this stage, the Court should not attempt to interpret the provisions of the agreement between Orlando and TMTG, or to determine (without the basis of testimony or supporting documents) how likely it was that Orlando would be required to pay the fee. The SEC has sufficiently alleged that the break-up fee clause was material.

C.  Orlando Acted With Scienter.

The SEC has sufficiently alleged that Orlando acted with scienter, defined as a "mental state embracing intent to deceive, manipulate, or defraud," *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)), and including both "intentional wrongdoing and conduct undertaken with extreme recklessness." *SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 321 (D.D.C. 2014) (citing *Dolphin & Bradbury v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008)). Extreme recklessness represents "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992)).

At the pleadings stage, the SEC need only have alleged facts that "taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). This inference "need not be irrefutable" or even the "most plausible of competing inferences." *Id.* at 324 (citation modified). Rather, the inference of scienter must be "cogent" and "at least as compelling as any opposing inference once could draw from the facts alleged." *Id.*

The SEC has more than passed this threshold. It has alleged that Orlando was the CEO and Chairman of both DWAC (Compl. ¶ 1) and SPAC A (*id.* ¶ 28). It also has alleged that Orlando knew that he was not permitted to discuss a merger between TMTG and DWAC until

DWAC had its IPO. (*Id.* ¶ 40.) Despite that knowledge, Orlando negotiated with TMTG in his capacity as CEO both of SPAC A (*e.g.*, *id.* ¶ 32) and DWAC (*e.g.*, *id.* ¶¶ 55, 82, 84). Moreover, he staffed DWAC's Board of Directors with individuals he knew would support a merger with TMTG (*id.* ¶¶ 49, 78) and carried out text message conversations about his plans to target TMTG for merger with DWAC (*id.* ¶¶ 63, 65-66, 85). He then reviewed and knowingly or recklessly signed public filings that falsely stated no such negotiations or targeting had occurred.

The occasional care Orlando took in recorded communications, such as when he wrote on May 31 that there was "no TMG SPAC," does not prove otherwise. (Compl. ¶ 56.) A week after that e-mail, Orlando sent a private text message promising that "DWAC" would "make the project clear[ly] more successful" (*id.* ¶ 63) and another message proposing that "we move TMTG" to DWAC. (*Id.* ¶ 66.) Indeed, the very e-mail in which Orlando publicly denied that there was a "TMG SPAC" hinted at the truth: Orlando followed his denial by noting "his extremely high confidence" that TMTG would end up with one of his SPACs and offering to "explain in person," rather than in a document that could be preserved. (*Id.* ¶ 56.) Thus, Orlando's public denials about the TMTG SPAC support the SEC's scienter allegations by evincing his knowledge that he should not publicly disclose in writing his private plans.

Orlando suggests that retaining "experienced SPAC corporate counsel" is evidence of good faith that disproves the SEC's allegations of scienter. (Def. Mot. at 23-24.) Of course, though "plaintiffs must plead the elements of their claims with specificity, they are not required to negate an affirmative defense in their complaint." *de Csepel*, 714 F.3d at 607-08 (citation modified). Thus, the presence of an attorney "in the room" at the time of the misstatements does not invalidate the SEC's Complaint. Reliance on advice of counsel "need not be a formal defense," but rather may be "evidence of good faith," to be considered "in evaluating a

defendant's scienter." *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004). In *Howard*, the Court considered evidence that the defendant's attorneys had overseen an "offering," drafted relevant documents, and "conveyed . . . approval" of certain conduct in evaluating that defendant's scienter. *Id.* at 1148. Crucially, the Court was *considering evidence* — because in *Howard*, the D.C. Circuit was asked to review an opinion by an SEC administrative law judge following an evidentiary hearing. *Id.* at 1138, 1141. Here, the Court has no evidence of "reliance" to speak of; just the bare fact (gleaned from several filed papers) that the same attorney appears to have advised both SPAC A and DWAC. (Def. Mot. at 23.) There is no evidence that Orlando received any advice from this attorney about those disclosures and no evidence that this attorney was fully informed of Orlando's behind-the-scenes machinations or his conversations with TMTG and others on behalf of DWAC. The mere existence of corporate counsel or the presence of a potential affirmative defense is not sufficient to render the SEC's well-pleaded allegations of fraud implausible.

D.   Orlando Obtained Money and Property as a Result of His Misstatements or Omissions.

Orlando obtained money or property as a result of his misconduct. Section 17(a)(2) of the Securities Act specifically requires a showing that the defendant "obtained money or property through the use of the misstatements or omissions." *RPM Int'l, Inc.*, 282 F. Supp. 3d. at 14. The SEC's allegations are more than sufficient here. Specifically, it alleges that by concealing that DWAC had preselected TMTG as a target for acquisition and by hiding his substantive negotiations with TMTG on behalf of DWAC before DWAC's IPO, Orlando ensured that DWAC could successfully IPO and immediately turn to acquiring TMTG. This resulted in DWAC raising $287.5 million from investors through its IPO and, ultimately, acquiring TMTG. (Compl. ¶ 25.) As a DWAC shareholder, Orlando reaped a considerable profit from this.

Moreover, Orlando owned a "significantly larger" percentage of DWAC than SPAC A, which had only raised $115 million. (*Id.* ¶¶ 28, 64.) Through his fraud, Orlando therefore created a larger company and obtained for himself a larger share of that company; this is sufficient to state a claim under Securities Act ¶ 17(a)(2).

E.    Orlando Carried Out a Deceptive Scheme.

The SEC has sufficiently alleged that Orlando violated Exchange Act Section 10(b), Rules 10b-5(a) and (c) thereunder, and Section 17(a)(1) and (3) of the Securities Act, which prohibit the use of "any device, scheme or artifice to defraud" and "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[9] 17 C.F.R. § 240.10b-5(b); 15 U.S.C. §§ 77q(a)(1), 77q(a)(3).

1.    Orlando's Deceptive Conduct Extends Beyond Misrepresentations.

Orlando's suggestion that the SEC has not alleged deceptive conduct beyond the purported misrepresentations (Def. Mot. at 26-27) is simply wrong.[10] The SEC alleges that by at least April 14, 2021, Orlando understood that (1) there was significant pushback from two SPAC A directors to a TMTG deal; and (2) that he could not talk to TMTG about a potential merger with a pre-IPO SPAC. (Compl. ¶¶ 34, 39-40.) Nevertheless, he acquired DWAC (stocking its board with SPAC A directors who had been in favor of merging with TMTG) while

---

[9] These subsections are sometimes referred to as "scheme liability" sections of the Securities and Exchange Acts.

[10] Orlando relies on Second and Eighth Circuit cases (Def. Mot. at 25) for the proposition that the SEC must allege conduct beyond misrepresentations to articulate a fraudulent scheme because, as the *Binance* opinion itself noted, the D.C. Circuit has "not addressed" whether alleged scheme liability "must include more than the same misrepresentations or omissions underlying the misstatement claims." *Binance Holdings Ltd.*, 738 F. Supp. 3d at 76. The Court need not resolve that question here, as the SEC has alleged a series of deceptive acts by Orlando independent of the false statements he made in DWAC's public filings.

simultaneously entering into a letter of intent between TMTG and SPAC A that kept TMTG from speaking to other SPACs while also preserving his ability to present DWAC as an alternative. Thus, before and after signing the June 4 letter of intent, Orlando planned to use DWAC as a more profitable vehicle for merging with TMTG and quietly took steps to ensure this scheme would succeed. Orlando then made multiple misleading public disclosures in DWAC's Forms S-1 in the summer of 2021 before, in September 2021, sending pretextual nondisclosure agreements and letters of interest to other merger "candidates" for DWAC. (Compl. ¶¶ 93-99.) Moreover, he took no meaningful steps during the summer of 2021 to actually merge TMTG with SPAC A. Finally, on the same day TMTG and DWAC signed their letter of intent, Orlando signed a separate agreement terminating the SPAC A letter of intent (unilaterally exclusive as to TMTG), which backdated the termination to September 1 and thereby retroactively permitted TMTG's negotiations with DWAC. In other words, from beginning to end, Orlando publicly disguised his preselection of TMTG to allow DWAC to move through the typical SPAC process, weaving his ongoing misstatements and omissions in with his other inherently deceptive acts. The SEC has more than met its burden of alleging that Orlando engaged in a deceptive scheme.

   2.   The SEC's Allegations Are Plausible.

Orlando suggests that this scheme is implausible because he did not control TMTG and, therefore, elements of his plan were out of his control. (Def. Mot. at 27-28.) He similarly points to TMTG's conversations with other SPACs as evidence that the SEC's claims are implausible. (Def. Mot. at 3, 29-30.) Orlando does not explain the reasoning behind his apparent proposition that a scheme is not plausible if some element is left to chance. Nor does he cite any caselaw in support of this novel contention. Moreover, the SEC has not claimed that TMTG preselected

DWAC, or that TMTG made any fraudulent disclosures in connection with the merger, or that

TMTG made an "attempt to skirt securities regulations." (Def. Mot. at 30.) All that the SEC has

alleged – and all that it is required to allege – is that Orlando had substantive conversations with

TMTG, and that Orlando took other steps targeting TMTG for merger with DWAC, contrary to

the explicit representations in the various public filings that he reviewed and signed. Whether or

not TMTG agreed or considered other alternatives is irrelevant.

Orlando also suggests that communications he made before he took over DWAC are

irrelevant because he had no control over the company at that time. (*E.g.*, Def. Mot. at 27-28.)

But the SEC alleges that an investment bank brought DWAC to Orlando in early April 2021,

specifically as an alternative to SPAC A for merging with TMTG. (Compl. ¶ 38.) It is reasonable

to therefore infer that Orlando was aware of TMTG as a target for DWAC by then. Indeed, one

can reasonably infer that this awareness drove Orlando to pursue and acquire DWAC. Orlando's

suggestion that it was impossible for him make plans or to have substantive conversations about

a potential acquisition of TMTG before he formally took over DWAC is baseless.

Orlando next suggests that DWAC's consideration of "alternate candidates" could not

have been "entirely pretextual" because it carried out that consideration "at great expense" and

dedicated "substantial resources and effort to identify, vet, and negotiate" with them. (Def. Mot.

at 28, 30.) This argument fails at every level. First, it is hardly implausible that, on the eve of a

nearly-$300 million acquisition that he had planned for six months, Orlando would cover his

tracks and make his disclosures seem plausible by inquiring about other potential DWAC targets.

Second, there is nothing in the Complaint or in the additional documents provided by Orlando

that suggests that DWAC went to "great expense" to consider these targets. The document cited

by Orlando refers to an "extensive meeting" with Target C on September 9, a "video conference"

with Target K on September 13, "discussions" with Target L and N on September 16,

conversations with Target D and Target J's management on September 20, and "multiple

discussions" with Target A on September 21. (Def. Mot., Ex. D, at 167.)[11] Even more tenuously,

Orlando cites Digital World "consider[ing]" a "potential" transaction with Target B,

"review[ing]" Target M's materials, "asking for access" to Target H, and being "provided

access" to Target E's data room. (*Id.*) It is not reasonable for the Court to infer that this took

place at "great expense." Nor would it be appropriate to make such an inference at this stage in

the proceedings. Whatever negligible evidentiary value these conversations have, they do not

erase or make implausible the substantial allegations made by the SEC.

F.   The Court Should Not Deny the SEC's Request for Disgorgement Before Discovery Has Even Begun.

      1.   Orlando's Motion to Deny the SEC's Request for Disgorgement Is Premature.

It would be inappropriate to dismiss the SEC's claims for disgorgement at this stage of

the case. Orlando's arguments regarding the sufficiency of the evidence supporting a specific

order of disgorgement are premature. (Def. Mot. at 30-32.) The SEC has not yet engaged in

discovery and has not yet arrived at a "reasonable approximation of profits causally connected to

the violation." (Def. Mot. at 31.) Nor is that showing required at this stage. "It is the usual

practice of trial courts to address outstanding liability questions before turning to the question of

remedy." *SEC v. Westport Cap. Mkts. LLC*, No. 3:17-cv-2064, 2019 WL 4857337, at *1

(S.D.N.Y. Sept. 30, 2019). Consistent with this common practice, the opinions Orlando cites

(Def. Mot. at 31) all concern the SEC's burden, *after trial*, to justify a disgorgement award. *See*

*SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1220, 1231-32 (D.C. Cir. 1989) (remedies phase of

---

[11] Each page of the document cited by Orlando appears to have three different page numbers. The SEC assumes that Orlando's pin cites refer to the number at the bottom right corner of the page and will refer to that number for consistency.

case after trial); *SEC v. Miller*, 808 F.3d 623, 626-27, 637 (2d Cir. 2015) (asset freeze after jury

trial); *SEC v. Levin*, 517 F. Supp. 2d 121, 126 (D.D.C. 2007) (remedies hearing after jury trial).

They are inapplicable here. Similarly, the court in *SEC v. Nielson*, No. 18-cv-1217, 2020 WL

9439395, at *1 (D.D.C. Feb. 13, 2020), ordered disgorgement after the defendant defaulted and

the SEC filed a motion for default judgment. Orlando does not and cannot cite any support for

his position that the SEC must establish a specific disgorgement amount in its Complaint. The

Court should deny his Motion.

> 2.   The SEC Has Properly Alleged a Claim for Disgorgement.

The SEC has sufficiently alleged facts supporting a claim for disgorgement and,

therefore, the Court should deny Orlando's premature request. Orlando's reliance on *Govil* is

misplaced. (Def. Mot. at 30.) As another court in this district recently noted, though the Second

Circuit limited disgorgement under the Securities Act "to the pecuniary losses of victims," in the

District of Columbia, "whether . . . securities violations injured others is irrelevant to the

question whether disgorgement is appropriate." *SEC v. Crystal World Holdings, Inc.*, No. 19-cv-

02490, 2025 WL 326593, at *2 (D.D.C. Jan. 28, 2025) (emphasis removed) (quoting *Zacharias

v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009)). Thus, in this Circuit, "pecuniary harm is probative

– but not dispositive – of the disgorgement inquiry." *Id.* at *3. Also "relevant," and also

recognized by the Supreme Court in *Liu*, is that disgorgement is "'in the heartland of equity'"

when it "'simply restores the status quo.'" *Id.* at *3 (quoting *Liu v. SEC*, 591 U.S. 71, 80-81

(2020)). Thus, the presence or absence of investor harm cannot, on its own, justify dismissal of

the SEC's disgorgement claims. *See also SEC v. Navellier & Assocs.*, 108 F.4th 19, 41 (1st Cir.

2024), *cert. denied*, 2025 WL 1603606 (2025) ("Appellants' argument that disgorgement was

not an available equitable remedy here because . . . clients did not suffer pecuniary harm mischaracterizes the nature and purpose of disgorgement").

Orlando also suggests that disgorgement is unavailable because the Complaint does not allege that he received illicit trading profits or ill-gotten gains. (Def. Mot. at 31.) To the contrary: the SEC alleges that Orlando engaged in a fraudulent scheme to bring DWAC to market as a blank-check SPAC despite knowing that he planned to target TMTG for acquisition, that Orlando was told that moving the deal would allow him to "make more money," and that he, in fact, obtained money or property as a result. *See supra* Part (III)(D). The SEC has therefore pled facts establishing that disgorgement is an available remedy.

Even if the Court were to adopt the Second Circuit's reasoning in *Govil*, which it should not, the SEC has sufficiently alleged that investors were harmed by Orlando's conduct. DWAC's IPO closed on September 8, 2021. (Compl. ¶ 91.) Between the IPO and the eve of the TMTG merger announcement, the stock price barely moved. (*Compare id.* ¶ 91 ($10 at IPO) *with id.* ¶ 102 ($9.96 on October 20)). During that time, investors (including an investor located in Washington, D.C.) sold shares of DWAC. (*Id.* ¶ 16.) These investors sold after Orlando made material misrepresentations that DWAC had had no substantive discussions with potential targets and that it had not identified any targets. In other words, they had every reason to believe that DWAC was the blank check company it claimed to be. By selling their shares before Orlando revealed the truth about DWAC on October 21, these investors missed a more-than 400% increase in the value of their holdings. (*Id.* ¶¶ 16, 102.)

G.  This Court Should Not Strike the SEC's Allegations Regarding DWAC.

Finally, Orlando asks the Court to strike all references to the SEC's settled administrative proceeding with DWAC, pursuant to Rule 12(f). (Def. Mot. at 32-33.) The Court should not take

the "disfavored" step of granting a motion to strike, *Pilkin v. Sony Interactive Entm't LLC*, No. 17-cv-02501-RDM, 2021 WL 2451299, at *1 (D.C. Cir. Mar. 19, 2021) (*per curiam*), because Orlando has presented no real justification for doing so. Many courts view this "drastic remedy" with "such disfavor" that they will grant such a motion only when the supposedly immaterial portions "'are also prejudicial or scandalous.'" *Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 51 (D.D.C. 2010) (citation omitted); *cf. Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 458 (D.D.C. 1994) (striking allegations because they were *both* irrelevant *and prejudicial*). Paragraph 104 of the Complaint is highly relevant to the case and is neither prejudicial nor scandalous. It alleges that, in a public filing made on November 23, 2023, DWAC described much of the conduct alleged in the Complaint. The Court may review these statements, which describe Orlando's efforts to pursue "Plan B" beginning in April 2021, for itself. (Ex. A, at 187/510-190/510.) The settlement between DWAC and the SEC provides relevant context for this filing. The Court should deny Orlando's motion to strike this paragraph.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's motion in its entirety.


Respectfully submitted,

<u>/s/  John B. Timmer</u>
John B. Timmer
timmerj@sec.gov
Andrew McFall
mcfalla@sec.gov
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Tel: +1 (202) 551 7687
Tel: +1 (202) 551 5538
Counsel for Plaintiff
Dated: August 15, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing on August 15, 2025, with the

Clerk of the Court for the United States District Court for the District of Columbia y using the

CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that

the service will be accomplished by the CM/ECF system.

<u>/s/  *John B. Timmer*</u>
John B. Timmer
timmerj@sec.gov
Andrew McFall
mcfalla@sec.gov
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Tel: +1 (202) 551 7687
Tel: +1 (202) 551 5538

Counsel for Plaintiff
Dated: August 15, 2025