### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **PATRICK ORLANDO**, <br><br> Defendant. | Case No. 24-cv-2097 (CRC) |

### MEMORANDUM OPINION AND ORDER

A special purpose acquisition company ("SPAC") is a shell corporation formed for the sole purpose of raising capital through an initial public offering ("IPO") and later using that funding to merge with (or acquire) an existing private operating company. Following the combination, the SPAC ceases to exist, and the target operating company lives on as a public corporation. SPAC mergers became popular at the beginning of the decade due to perceived advantages over the traditional IPO process, including more certain pricing and faster, cheaper public listings. Like other entities that offer securities to the public, SPACs are regulated by the Securities and Exchange Commission ("SEC"). See generally Compl. ¶¶ 18–23 (describing how SPACs operate); What You Need to Know about SPACs, Investor.gov (Aug. 21, 2024), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/what-you.

SPACs are commonly formed by investors (or "sponsors") with experience in particular industries. With a nominal investment, a sponsor, which itself may be a corporation, can obtain substantial ownership of the SPAC, sometimes upwards of twenty percent. The sponsor typically will not have identified a target company when the SPAC conducts its IPO; otherwise,

securities regulations might require the SPAC to make more detailed public disclosures about the potential target.  The SPAC will instead have a limited amount of time, say two years after it goes public, to locate and combine with a target.  As a result, prospective SPAC investors generally must rely on the sponsor's reputation and track record, rather than the identity of any merger partner, in deciding whether to invest.  But if a partner is identified and a deal approved, a SPAC investor typically can redeem his investment for cash if he would prefer not to hold shares in the combined operating company.  See generally What You Need to Know about SPACs, supra.

Enter Miami businessman Patrick Orlando, Chairman and CEO of a SPAC called Digital World Acquisition Corp. ("Digital World" or "DWAC").  In September 2021, Digital World completed an IPO that raised $287.5 million from the investing public.  About a week prior to the IPO, Orlando signed an SEC disclosure form on Digital World's behalf.  Among other representations, the disclosure stated that neither Digital World nor its representatives had "engaged in any substantive discussions, directly or indirectly, with any business combination target" or "selected any specific business combination target."  Compl. ¶ 86.

This case stems from those statements.  In a detailed complaint, the SEC alleges that Orlando's representations, along with similar ones contained in interim public disclosures filed in the spring and summer of 2021, were misleading.  In fact, according to the Commission, Digital World had engaged in extensive pre-IPO merger discussions with a specific target company—Trump Media and Technology Group Corp. ("Trump Media," "TMTG," or "TMG")—which resulted in a letter of intent to merge just two weeks after the IPO and a definitive merger agreement a month later.  The SEC claims that Orlando's misrepresentations violated Section 10(b) of the Exchange Act of 1934, Rule 10b-5 thereunder, and Section 17(a) of

the Securities Act of 1933.  The Commission's suit against Orlando followed a November 2023 settlement of related charges against Digital World itself.

Orlando now moves to dismiss the SEC's complaint and strike its references to the SEC's separate settlement with Digital World.  While Orlando advances multiple grounds for dismissal, his motion centers on the argument that any misrepresentations he may have made were not material to a reasonable investor's decision to invest in Digital World.  This contention echoes the reasoning laid out in SEC Commissioner Mark T. Uyeda's December 2024 dissent from the SEC's decisions to charge Digital World and several other SPACs for false and misleading statements regarding their preliminary communications with potential combination partners.  In Commissioner Uyeda's (and Orlando's) view, any such communications are immaterial as a matter of law because, unlike that of operating companies, the sole purpose of a SPAC is to combine with another company.  Given this purpose, the argument goes, it should come as no surprise and therefore matter not to investors that a SPAC's operators would communicate with potential combination partners, even substantively, as part of their day-to-day activities.

The point is a fair one, but it doesn't take Orlando far.  While exploratory communications with potential partners might be routine in the everyday operation of a SPAC, the SEC has plausibly alleged far more than that here.  The Commission's complaint paints a picture not of quotidian preliminary merger discussions, but of a concerted scheme by Orlando to use Digital World to merge with a selected target, implemented over the course of months prior to the IPO and consummated soon after.  And the SEC alleges that Orlando undertook that scheme while affirmatively telling investors that no such merger plan existed.  Because a jury could well conclude that knowledge of the alleged plan and the surrounding discussions would have influenced an investor's decision to invest—or not invest—in Digital World, the Court will

deny Orlando's motion to dismiss on that ground.  It also rejects the other grounds for dismissal and the motion to strike, as explained further below.

## I.    Background

The SEC's complaint details a series of high-level interactions between representatives of Digital World and Trump Media throughout the spring and summer of 2021 and juxtaposes those interactions with seemingly contrary statements made in Digital World's SEC disclosures.  A somewhat lengthy summary follows.  Orlando no doubt disputes some of the alleged facts, or at least the inferences that may reasonably be drawn from them.

Trump Media was founded in February 2021.  Compl. ¶ 31.  (Although not mentioned in the complaint, Trump Media operates the social media platform Truth Social.)  Not long after, one of Trump Media's representatives contacted Patrick Orlando in his then-capacity as CEO of an existing SPAC, which the complaint refers to as SPAC A.[1]  Id. ¶ 32.  The two soon met in person to discuss the possibility of a potential merger between SPAC A and Trump Media.  Id. Those discussions led to the execution of a non-exclusive letter of intent between the two companies to negotiate a potential combination.  Id. ¶ 33.  As that non-exclusive letter reached its expiration date, the parties discussed signing a new, mutually-exclusive letter of intent. However, two of SPAC A's directors and one of its officers opposed pursuing a merger with Trump Media, and the parties ultimately did not sign the letter.  Id. ¶ 34.

Soon after, the SEC alleges that Orlando conceived of two plans, which he coined "Plan A" and "Plan B," to pursue a combination with Trump Media.  Id. ¶ 35.  Plan A was to continue to try to have SPAC A merge with Trump Media, perhaps by removing the SPAC A officials

---

[1] Orlando identifies SPAC A in his briefing as Benessere Capital Acquisition Corp.  See Def.'s Mot., Ex. C.  For ease of reading, the Court will refer to it as SPAC A.

who did not support the transaction.  Id. ¶ 36.  Plan B, according to the SEC, was to find an alternative SPAC to combine with Trump Media.  Id. ¶ 37.  Orlando then began raising money to fund the alternative SPAC, which he and another SPAC A director (who ultimately became a Digital World director) allegedly referred to as "the Trump SPAC."  Id.  Consistent with Plan B, a representative of a China-based investment bank—which served as a financial advisor to SPAC A and Digital World, id. ¶ 29—emailed Orlando on April 9, 2021, stating that "[Digital World] could be a solution for Trump."  Id. ¶ 38.  At that time, the investment bank held a majority interest in DWAC's sponsor, which was a Delaware-based corporation.  Id. ¶¶ 27, 38. At a subsequent meeting with representatives of Trump Media, Orlando allegedly shared that SPAC A could not pursue the merger with Trump Media due to internal opposition but indicated that he would attempt to identify another vehicle for the potential merger.  Id. ¶ 39.  The SEC alleges that a representative of the investment bank later messaged Orlando, saying, "[w]e do Trump one way or another" and "we'll figure it out."  Id. ¶ 42.

Near the end of April, the investment bank reportedly informed Orlando that he could obtain significant control over Digital World.  Id. ¶ 44.  Orlando proceeded to sign a letter of intent to acquire a 90 percent ownership stake in Digital World's sponsor.  Id.  The SEC states that around that time, Trump Media representatives discussed internally that SPAC A intended to "tieup" Trump Media with a "big breakup fee."  Id. ¶ 45.  The SEC claims that Orlando continued having conversations with Trump Media representatives about a potential agreement. Id. ¶ 46.  Several weeks later, Orlando and representatives of the investment bank exchanged messages in which Orlando expressed his belief that Digital World should combine with Trump Media and SPAC A should pursue a different target.  Id. ¶ 47.  In mid-May, the investment bank

transferred Orlando a 90 percent ownership interest in Digital World's sponsor and Orlando became the SPAC's CEO and Chairman.  Id. ¶ 48.

In late May 2021, Digital World filed an initial SEC Form S-1 registration statement, signed by Orlando ("May Form S-1").  Id. ¶ 49.  The form listed two nominee directors to Digital World's board who were previously SPAC A directors and who the SEC claims had supported a merger between SPAC A and Trump Media.  Id.  It also listed a CFO, who is said to have expressed enthusiasm about an acquisition of Trump Media as well.  Id. ¶ 50.  None of the SPAC A directors or officers who had opposed a Trump Media acquisition joined Digital World, according to the SEC.  Id.

The May Form S-1 included the following statement: "We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us."  Id. ¶ 51.  Five days after the initial Form S-1 filing, the SEC alleges that Orlando, Digital World's in-house counsel, "Individual X" (who eventually became a Digital World director, id. ¶ 30), a Trump Media co-founder, and Trump Media's outside counsel met at Individual X's home for a "brainstorming session[]."  Id. ¶ 55.  A video of the meeting is said to show Orlando thanking attendees for figuring out "how to get this done" and a Trump Media representative saying that a Digital World executive (who called into the meeting) would be a "big part of this."  Id.  An individual who had helped raise funds for Digital World's sponsor reportedly asked Orlando the next day, "Is there any brochure ready for TMG SPAC?"  Id. ¶ 56.  Orlando allegedly responded: "There is no TMG SPAC.  There is a SPAC and I have a great relationship with TMG.  I believe with extremely high confidence that TMG will [end] up in one of my SPACs.  Better I explain in person."  Id.

In early June, the complaint alleges, Orlando moved forward with a plan to have SPAC A sign another letter of intent with Trump Media despite continued objections to a merger by several SPAC A officials.  Id. ¶ 57.  This letter would be unilaterally exclusive: it would prevent Trump Media from negotiating with other SPACs but would allow SPAC A to negotiate with other targets.  Id.  The SEC claims that on June 1, as the parties prepared to sign the agreement, Orlando informed a director of both SPAC A and Digital World, "I want Trump to meet the SPAC A AND DWAC team."  Id. ¶ 58.  A few days later, SPAC A, Trump Media, and Orlando (in both his personal capacity and in his capacity as CEO of SPAC A) signed the unilaterally-exclusive letter of intent.  Id. ¶ 60.  The letter reportedly required Orlando personally to pay a $1 million break-up fee if the agreement did not proceed.  Id. ¶ 61.  However, it also contained a clause that would release Orlando from paying the fee so long as he proposed an "alternative [SPAC] with combination terms that are acceptable" to Trump Media ("Break-up Fee Clause"). Id. ¶ 61.

A few days after the letter of intent was signed, the SEC claims Orlando received the following text from a director of both SPAC A and Digital World: "I still don't know why you are switching it out of [SPAC A] other than you will make more money. I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic."  Id. ¶ 63.  Orlando responded that "[Digital World] is better and will make the project clear [sic] more successful." Id.  Orlando also reportedly shared with a representative of the investment bank that he wanted to get "Trump…a DWAC" tombstone "THE SIZE OF A GOLF CART!!"  Id. ¶ 65.[2]  Soon thereafter, Orlando allegedly wrote the following to the investment bankers: Trump Media is

---

[2] In the financial industry, a "tombstone" or "deal toy" is a memento to commemorate the closing of a transaction.  See Compl. ¶ 65.

"ours wherever we want.  Let's make it DWAC."  And "they [are] exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move [Trump Media] there and close [other target] [SPAC A]. [sic] It's crazy but let me try!!"  Id. ¶ 66.  Orlando also reportedly shared with a Digital World representative an analysis calculating the value of Digital World's sponsor shares should the merger with Trump Media end up at $375 million.  Id. ¶ 68.

The complaint documents similar communications in July 2021.  For example, a Digital World investor copied Trump Media's outside counsel on emails that allegedly mentioned "one major standout" acquisition target and invited potential investors to join "a call with Patrick's team[,] and [Trump Media's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."  Id. ¶ 77.  And Individual X allegedly sent to Digital World's CFO a message in Spanish that the SEC translates to read, "Onward! Let's make history with DWAC + TMG."  Id. ¶ 80.

 Digital World filed another Form S-1 ("July Form S-1") on July 8, 2021, upping its planned public offering from $100 million to $300 million and adding Individual X—who had repeatedly been in contact with Trump Media—as a director.  Id. ¶ 78.  The form also repeated the same statements made in the May Form S-1 about not having had any combination targets or contacts with targets.  Id. ¶ 79.  Soon thereafter, Orlando allegedly met with representatives of Trump Media at its offices in Sarasota, Florida.  Id. ¶¶ 26, 81.  Following the meeting, the SEC claims that a Trump Media representative messaged Orlando that "[t]oday was a big day for TMG and a huge step for our team to be able to meet and spend time with you. Thank you so much for making the trip."  Id. ¶ 81.  A Trump Media executive also purportedly sent himself an audio note around this time indicating that Trump Media might flip its agreement from SPAC A to "another SPAC."  Id. ¶ 82.

Moving to August, the complaint recounts Individual X setting up a meeting between Trump Media and Digital World to take place immediately after Digital World's planned IPO. Id. ¶ 83. The following week, a Trump Media representative is described as sending himself an email indicating that "[e]verything is lined up. Platform is weeks away. Backed by $300 million in cash. Billions of stock. Press conference video is ready. Only thing missing is license Agreement." Id. ¶ 84.[3] And at the end of August, Orlando is said to have received a text from a Digital World representative that read, "Talked to [Trump Media's outside counsel]. Trump Media wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement. I told them we'd need a month. Probably gonna settle at 2-3 weeks." Id. ¶ 85.

All told, the SEC submits that Trump Media's in-house counsel, Orlando, and Individual X had upwards of 100 conversations between May 25, 2021 (when the initial Form S-1 was filed) and September 2, 2021 (the day before Digital World's IPO), including at least one between Orlando and Trump Media's outside counsel about Digital World merging with Trump Media. Id. ¶ 74. By contrast, the SEC claims that Orlando's conversations with the investment bank about SPAC A during the summer "predominantly" concerned the "evaluation of other acquisition targets." Id. ¶ 70.

Digital World filed an amended form S-1 ("Final Form S-1"), signed by Orlando, on August 31, 2021. Id. ¶ 86. The form contained the following statement about Digital World's contacts (or lack thereof) with potential targets:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any

---

[3] The complaint notes that Trump Media was at that time renegotiating a licensing agreement and that Digital World had recently announced a planned $300 million IPO. Id. ¶ 84.

substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

Id. ¶ 86.  And this one:

> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target.  From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination.  Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business.  However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders.  Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

Id. ¶ 87.  And this one:

> We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. . . .

Id. ¶ 88.

Digital World held its IPO between September 3, 2021, and September 8, 2021, raising some $287.5 million.  Id. ¶ 91.  The day the IPO closed, according to the complaint, Digital World sent a non-disclosure agreement to Trump Media, which Trump Media signed five days later.  Id. ¶ 93.  Trump Media's outside counsel sent Digital World's in-house lawyer a draft of an exclusive letter of intent the next day.  Id.  The SEC claims that Digital World then began coordinating an in-person event for the signing of the letter of intent and discussed the possibility of a press conference, which Trump Media hoped to hold.  Id.  The complaint also describes communications around this time between Digital World and other ostensible targets, which the Commission suggests were pretextual given the advanced nature of the discussions between Digital World and Trump Media.  Id. ¶¶ 95–99.

On September 22, 2021, Digital World's board formally approved, and the two companies signed, the letter of intent between Trump Media and Digital World.  Id. ¶ 100. Orlando and Trump Media then executed a termination agreement ending Trump Media's letter of intent with SPAC A, thereby freeing Orlando from the Break-up Fee Clause.  Id.  A definitive merger agreement between Trump Media and Digital World was announced after the market's close on October 20, 2021.  Id. ¶ 101.  The following day, Digital World's stock closed at $45.50, a more than 400 percent increase from its closing price the day before.  Id. ¶ 102.

The SEC claims that Orlando continued to misrepresent the nature of Trump Media and Digital World's negotiations in Digital World's Form S-4 filed in May 2022, including by omitting the execution of, and Orlando's release from, the Break-up Fee Clause.  Id. ¶ 103.

In July 2023, the SEC instituted a settled cease-and-desist proceeding against Digital World.  Id. ¶ 104.  As a part of the settlement, the SEC required Digital World to ensure that any amended Form S-4 reflected the Commission's findings.  Id.  Digital World later amended its Form S-4 in November 2023 and incorporated many of the facts laid out by the SEC.  Id.  As noted above, SEC Commissioner Uyeda dissented from the decision to charge Digital World, which he later explained in a statement concerning several cases in which the SEC charged a SPAC for alleged material misstatements in their public disclosures.  Mark T. Uyeda, Sec. and Exch. Comm'n, Dissenting Statement Regarding Recent SPAC Cases, Speeches and Statements (Dec. 12, 2024) ("Uyeda Statement").

The SEC filed the present complaint against Orlando in July 2024.  The complaint seeks disgorgement, civil monetary penalties, and an order barring Orlando from serving as a director or officer of any issuer of securities registered pursuant to Section 12 of the Exchange Act.  In February 2025, Orlando moved to dismiss the complaint under Rule 12(b)(6).  The Court stayed

the case in April 2025 to enable the parties to attempt to negotiate a settlement. Orlando

renewed his motion to dismiss in August 2025 after those negotiations apparently broke down.

The SEC opposes the motion. The Court heard oral argument on December 19, 2025.

## II.    Standard of Review

When analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

Court "must treat the complaint's factual allegations as true, and must grant plaintiff the benefit

of all inferences that can be derived from the facts alleged." Giliana v. Blinken, 596 F. Supp. 3d

13, 17 (D.D.C. 2022) (Cooper, J.) (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111,

1113 (D.C. Cir. 2000)). However, a court need not accept inferences drawn by the plaintiff that

are unsupported by facts alleged in the complaint, nor accept the truth of a plaintiff's legal

conclusions. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)). At the motion to dismiss stage, the Court may take judicial notice of

"public records, including SEC filings." SEC v. RPM Int'l, Inc., 282 F. Supp. 3d 1, 10 n.4

(D.D.C. 2017).

Because the SEC alleges fraud, it must meet the heightened pleading requirements of

Federal Rule of Civil Procedure 9(b). SEC v. Binance Holdings Ltd., 738 F. Supp. 3d 20, 36–37

(D.D.C. 2024) ("The D.C. Circuit applies Rule 9(b)'s pleading standards to claims of

misrepresentation under Section 10(b) of the Exchange Act."); id. at 37 (citing caselaw in this

district and in other circuits and applying the Rule 9(b) standard to Section 17(a)(2) and (a)(3)

claims). "Conclusory allegations that a defendant's actions were fraudulent and deceptive are

not sufficient to satisfy Rule 9(b)." Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 73

(D.D.C. 2002).  The SEC must plead (i) "the time, place and content of the false

misrepresentations," (ii) "the fact misrepresented," and (iii) "what was retained or given up as a

consequence of the fraud."  <u>Binance Holdings</u>, 738 F. Supp. 3d at 37 (quoting <u>Kowal v. MCI

Commc'ns Corp.</u>, 16 F.3d 1271, 1278 (D.C. Cir. 1994)).  Rule 9(b) does, however, "specifically

allow[] allegations of intent, knowledge, and other condition of mind to be averred generally."

<u>Id.</u> at 36–37 (citation omitted).

## III.  Analysis

The first claim in the SEC's complaint alleges a violation of Section 10(b) of the

Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) ("Section 10(b)"), which permits the

Commission to "prescribe as necessary" regulations to prohibit "any manipulative or deceptive

device or contrivance" "in connection with the purchase or sale" of securities.  Relevant here is

Rule 10b-5, which is issued under that authority and prohibits, among other things, the untrue

statement or omission of a material fact in connection with the purchase or sale of any security.

<u>See</u> 17 CFR § 240.10b-5(b).  The SEC's second claim alleges a violation of Section 17(a) of the

Securities Act of 1933, codified at 15 U.S.C. § 77q(a) ("Section 17(a)"), which, in the relevant

portions, prohibits individuals from "employ[ing]" a "scheme . . . to defraud," "obtain[ing]"

money or property by means of any untrue statement of a material fact," and "engag[ing] in any

transaction, practice, or course of business which operates or would operate as a fraud or deceit

upon the purchaser."

Orlando moves to dismiss the complaint in part or in full on multiple grounds.  First, he

argues that the statements attributed to him were not misleading and that the inferences the SEC

draws from the alleged facts are mistaken.  Second, he asserts that even if his statements were

misleading, they were not materially so.  Third, he argues that he did not act with scienter, as is

required for liability under Section 10(b), Rule 10(b)-5, and Section 17(a)(1).  Fourth, he contends that the SEC has not adequately alleged that he acquired money and property as it must to establish liability under Section 17(a)(2).  Fifth, he urges that the SEC has not adequately alleged that he is subject to scheme liability under Section 17(a)(1) or (a)(3) because the SEC has not alleged that he took deceptive actions beyond his allegedly misleading statements.  Sixth, he argues that disgorgement is not available as a remedy because the SEC has not shown investor harm.  And finally, he moves to strike references to the SEC's prior settlement with Digital World.  The Court takes each argument in turn.

### A.  Misleading Statements

The SEC alleges that the series of disclosure forms that Orlando signed in 2021 contained misleading statements about Digital World (1) not having substantive contacts with a potential target, (2) not having selected a merger target, and (3) not having targeted a company SPAC A had rejected.  The first two sets of statements are plainly misleading as alleged.  While the third presents a closer question, the Court finds that the SEC has plausibly alleged that those statements were misleading as well.

#### 1.  Contacts and Preselection

As the Court's summary of the complaint should make clear, the SEC has plausibly alleged that Orlando made misleading statements by claiming that Digital World had no prior conversations with a potential merger or acquisition target.  For example, each of Digital World's S-1s states that "[t]o date . . . we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us."  Compl. ¶¶ 51, 86; see also id. ¶ 87.  Yet, the SEC claims that after learning from his investment bankers in April 2021 that Digital World could be

a vehicle for merging with Trump Media, Orlando almost immediately met with representatives of Trump Media about a potential transaction with DWAC instead of SPAC A.  Id. ¶¶ 38–39. According to the complaint, the contacts intensified in both volume and specificity as time passed.  The SEC alleges, for example, that the parties spoke more than 100 times between May 25 and September 2, id. ¶ 74; that just before Digital World's July Form S-1 was filed, Individual X told a Trump Media representative that Trump Media and Digital World would make history together, id. ¶ 80; that in July, Orlando spent the day with the Trump Media team, id. ¶ 81; that a Trump Media executive acknowledged in July that the merger might "potentially [be] flipping [] to another SPAC", id. ¶ 82; and that in August a Digital World director confirmed a meeting between representatives of the two companies for not long after Digital World's planned IPO, id. ¶ 83.  These allegations, if true, plausibly establish that Digital World's public statements about having had no contacts with any potential merger partner were misleading.

The SEC separately alleges that Orlando made misleading statements in repeated public disclosures he signed indicating that Digital World had not preselected a merger target.  See, e.g., id. ¶¶ 51, 86 (May and Final Forms S-1 stating that "[t]o date . . . [w]e have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us").  The SEC has again offered sufficient facts to support this claim.  For instance, it describes a May 2021 text message from Orlando opining that Digital World was the "optimal" combination for Trump Media, id. ¶ 47; it reports that Digital World brought on directors from SPAC A who supported acquiring Trump Media; it recounts that Orlando told one director, "[Digital World] is better and will make the project . . .

more successful," id. ¶¶ 63–64; it alleges that Orlando communicated his desire to give

"[T]rump . . . . a DWAC [tombstone] THE SIZE OF A GOLF CART!!", id. ¶ 65; it recounts

Orlando telling a colleague following the signing of a letter of intent between Trump Media and

SPAC A, "Let's make it DWAC," and sharing financial valuations for a Digital World

acquisition of Trump Media, id. ¶¶ 66, 68; and it claims a Digital World investor set up a call

with Orlando and Trump Media's outside counsel for other would-be investors in which they

could learn about a "standout" acquisition target. Id. ¶ 77. These allegations plausibly suggest

that Digital World had selected Trump Media as a merger target while disavowing having

decided upon any target in its public disclosures.

Orlando retorts that the inclusion of other information in the disclosures cures any defects

in the statements. Namely, he points to disclosures touting his "established deal sourcing

network," "quality deal pipeline," and "wide network" that would allow him to "source

acquisition targets." Def.'s Mot. at 17–19. Orlando submits that "colorful braggadocio aside,"

statements attributed to him in the complaint about a potential combination with Trump Media

"demonstrate[] precisely what DWAC disclosed—[that] DWAC would have access to a unique

pipeline of potential targets based upon its executives' preexisting business relationships." Id. at

18–19. But as recounted above, the SEC has plausibly characterized Digital World's

communications with Trump Media as reflective of more than simply Orlando's extensive deal

pipeline. The SEC's narrative suggests preselection and substantive merger discussions

throughout the period bracketing Digital World's IPO. Accepting that narrative as true, Digital

World's disclosures about Orlando's industry relationships, accurate as they may be, cannot

serve to correct for its repeated representations that no target had been identified or contacted.

Orlando was not just shopping around in the SEC's telling—he had his eyes on one prize.

Orlando also argues that the SEC has not pled with sufficient particularity under Federal Rule 9(b) that conversations between him (and Individual X) and Trump Media related to a Trump Media merger with Digital World, rather than a combination with SPAC A.  Id. at 16. The Court disagrees.  As detailed above, the SEC has sufficiently pled "the time, place and content of the false misrepresentations," (ii) "the fact misrepresented," and (iii) "what was retained or given up as a consequence of the fraud."  Binance Holdings, 738 F. Supp. 3d at 37. From these allegations, the Court can reasonably infer that Orlando (in his capacity as Digital World's CEO and Chairman) and other Digital World representatives had selected Trump Media as a target and held substantive merger conversations with Trump Media while stating in Digital World's public filings that it had not done so.

### 2.  Digital World's Targeting of a Company that SPAC A Rejected

The SEC also characterizes as misleading the statement that Digital World had not contacted any prospective target that SPAC A had rejected.  See Compl. ¶ 88 (noting the statement in DWAC's Final Form S-1 that, "We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. . . ." ).  This is the closest call of the three sets of statements.  The SEC claims that the statement was misleading because "discussions between SPAC A and [Trump Media] had ceased before [Digital World's] IPO" and that the continued opposition to a Trump Media merger by certain of SPAC A's directors and officers indicates that SPAC A would not proceed with the agreement.  Pl.'s Opp'n at 14.  According to the SEC, Orlando's conversations with the investment bank about SPAC A during the summer "predominantly" concerned the "evaluation of other acquisition targets" besides Trump Media.  Compl. ¶ 70.

One reading of the SEC's allegations could be that SPAC A was waiting in the wings to acquire Digital World in case the deal between Digital World and Trump Media did not materialize.  Adopting this interpretation, Orlando points out that Trump Media indicated in its own Form S-4 that SPAC A had yet to reject Trump Media.  See Def.'s Mot. at 19.  But the SEC's reading of the statement and surrounding facts is plausible as well, which is all that is required at this early stage of the case.  See Iqbal, 556 U.S. at 678 (holding that the court need only be able to "draw the *reasonable* inference that the defendant is liable for the misconduct alleged" (emphasis added)).

B.  Materiality

As previously noted, the core of Orlando's motion is his argument that any misleading statements in Digital World's public disclosures were not material.

A fact is material when there is "a substantial likelihood that a reasonable shareholder [or investor] would consider it important in decid[ing] how to vote [or invest]."  Rockies Fund, Inc. v. SEC, 428 F.3d 1088, 1096 (D.C. Cir. 2005) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)).  "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1975).  Materiality does "not require a showing of actual harm to investors."  Rockies Fund., 428 F.3d at 1097.  And it is evaluated at the time of the transaction, rather than after the fact.  See Media Gen., Inc. v. Tomlin, 387 F.3d 865, 869 (D.C. Cir. 2004).  Because materiality "is a mixed question of law and fact," "courts have cautioned against granting a motion to dismiss based on the failure to plead materiality unless the information is so obviously

unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." RPM Int'l, Inc., 282 F. Supp. 3d. at 23 (citation modified) (collecting cases).

As to pre-merger discussions specifically, the Supreme Court explained in Basic that "[w]hether merger discussions in any particular case are material [] depends on the facts," and "on the significance the reasonable investor would place on the withheld or misrepresented information." 485 U.S. at 239–40. Fleshing out the relevant considerations, the Court observed that, among other factors, in "order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels." Id. at 239. It further stressed that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." Id. And it pointed out that potential mergers can be material "even though the mortality rate of mergers in such formative stages is doubtless high." Id. at 238 (quoting SEC v. Geon Industries, Inc., 531 F.2d 39, 47–48 (2d Cir. 1976) (Friendly, J.)). Neither party presents on-point authority for assessing materiality in the scenario alleged here, where a blank-check SPAC affirmatively states that it has not preselected a merger target or had meaningful contact with any target.[4]

---

[4] The cases Orlando cites do not bear on materiality in this context. One, In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3rd Cir. 1997), curiously lacks any holding pertaining to merger discussions. The other, Taylor v. First Union Corp. of S.C., 857 F.2d 240 (4th Cir. 1988), concerned a party failing to disclose a potential merger, rather than actively stating that discussions had not occurred. And "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Id. at 243 (quoting Basic, 485 U.S. at 239 n.17). Here, the SEC alleges that Orlando made affirmatively misleading statements in Digital World's Form S-1s, not that he failed to disclose necessary information. Further still, the merger at issue in Taylor was not legally possible at the time of the disclosure. By contrast here, Digital World and Orlando were legally able to merge with Trump Media.

### 1. Preselection and Contacts

Starting with the materiality of the statements about not having selected or communicated with a potential merger target or a target that SPAC A had rejected, Orlando contends that, as a matter of law, preliminary discussions between a SPAC and potential targets cannot be material until close to the actual acquisition. As noted above, this argument mirrors the view of SEC Commissioner Mark Uyeda, who in his dissenting statement explains:

> The SPAC's 'death' is planned for and sought after from the time the SPAC is formed. Given this distinction, the probability/magnitude test, as applied to information concerning a SPAC's preliminary merger negotiations, should result in such information not becoming material until a *time much closer* to the SPAC and target company reaching a binding agreement on the acquisition price and structure.[5]

Def.'s Mot. at 21 (emphasis in original) (quoting Uyeda Statement).

The Court takes no issue with Commissioner Uyeda's starting point: SPACs exist only to combine with another company, so it cannot be that every one-off discussion that they have with a potential target is material to an investor's decision to invest in the SPAC. And the timing of these discussions surely matters. An exploratory discussion held long in advance of a deal, with no further contact until much closer to a merger or an acquisition, would be highly unlikely to be material. That is particularly so if the counterparty is one of many companies the SPAC had under consideration as a potential target.

But that is not this case. The gravamen of the SEC's complaint is that Digital World *selected* Trump Media as a target months before its IPO and had extensive communications with

---

[5] The Court notes that the Supreme Court rejected a slightly more extreme version of this argument for traditional mergers in Basic. 485 U.S. at 236 ("We therefore find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.")

Trump Media that continued right up to the IPO, culminating in a definitive merger announcement just weeks later.  Should the SEC's narrative bear out, a jury could readily conclude that a potential investor in DWAC would have wanted to know that a specific target operating company was in the wings and that a deal might be just around the corner.  Such information would appear to be highly relevant.  Had potential investors been aware of any likely target, they could have evaluated its financial wherewithal and future business prospects, rather than rely on Orlando's bona fides alone.  The identity of the target as Trump Media only adds to the likelihood of materiality.  Fans of the then-former President who passed on the IPO might have jumped at the chance to buy into his social media aspirations had they been aware of the target.  The proof may be in the pudding:  As the SEC points out, DWAC's share price quadrupled after the merger agreement was publicly announced, so those who stayed on the sidelines missed out on the bounty.[6]  Conversely, detractors of the President who chose to back Orlando might not have done so (or invested less) had they known they were likely staking Trump Media.  It is therefore entirely plausible that disclosure of DWAC's alleged preselection of and extensive, high-level discussions with Trump Media would have "significantly altered" the "total mix of information" that a reasonable investor would have considered important.  TSC Indus., 426 U.S. at 449.  That is particularly so given the high likelihood of the acquisition, assuming the truth of the SEC's account of each company's keen interest in the deal.  Basic, 485 U.S. at 239.  At the very least, the information was not "so obviously unimportant to a

---

[6] The Court recognizes there is a circuit split as to whether the market's after-the-fact reaction can be considered in the materiality analysis in light of the Supreme Court's holding in Basic.  See RPM Int'l, 282 F. Supp. 3d at 24 (collecting cases).  The market's reaction is far from determinative here; the Court simply cites it to emphasize its point that the identity of the target is something a would-be investor might have wished to know.

reasonable investor that reasonable minds could not differ on the question of [its] importance"

such that dismissal as a matter of law would be warranted.  RPM Int'l, 282 F. Supp. 3d. at 23.

The fact that investors in DWAC's IPO had a right to redeem their stakes for cash does

not change the outcome, as Orlando suggests.  See Def.'s Mot. at 21.  Although the availability

of redemption rights might offer protection to shareholders, it does not immunize a SPAC from

liability for misstatements in public disclosures.  First, taking Orlando's argument at face value

would mean that no pre-merger discussions with or selections of targets could be material,

because redemption rights would always be there to save the investor.  Such a holding would be

inconsistent with even Commissioner Uyeda's view, under which discussions sufficiently close

to a merger could still be material.  Second, the information about targets and pre-merger

discussions might still bear on the decision whether to invest or sell, redemption rights aside.  As

the SEC points out, redemption rights would not protect investors who sold their Digital World

shares without knowing that Trump Media was the target.  See Pl.'s Opp'n at 19.  And the

redemption rights in question were not absolute, as they did not protect holders of certain types

of Digital World securities.  See e.g., Def.'s Mot., Ex. F (Final Form S-1) at 23 (indicating that

warrants, which entitle investors to purchase future shares at a given price, would not come with

redemption rights).  These considerations indicate that the existence of redemption rights is a

consideration that might factor into the materiality analysis at the summary judgment or trial

stage but is not a ground for dismissal as a matter of law under Rule 12(b)(6).

In sum, the SEC has plausibly alleged that the disclosures Orlando signed misled

investors by representing that Digital World had not selected or held substantive discussions with

a potential merger partner, when in fact it had held extensive, high-level discussions about a

possible combination with Trump Media.  While Orlando may quarrel with the SEC's

interpretation of the detailed facts laid out in the complaint, accepting those facts, the Court cannot conclude that the alleged misstatements were immaterial to a reasonable investor.

### 2. The Break-up Fee Clause

Next, recall the Break-up Fee Clause, which required Orlando to pay a $1 million fee to Trump Media if the agreement with SPAC A did not pan out—unless he found another SPAC with which Trump Media was willing to merge. DWAC's May 2022 Form S-4 did not mention the execution and release of the clause, an omission which the SEC claims was materially misleading. Orlando responds that he had no duty to disclose the clause, and even if he had such a duty, the omission was not material.

Under Section 10(b) and Rule 10b-5, a defendant has a duty to disclose "a material fact necessary in order to make [his] statements . . . not misleading," in "light of the circumstances under which they were made." Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 264 (2024) (quoting 17 C.F.R. § 240.10b-5(b) (2022)). In the context of the Form S-4, the SEC plausibly alleges that the failure to mention the Break-up Fee Clause made it seem as though Orlando had no personal interest in the agreement between these two entities, that the companies that Digital World considered were all on an equal playing field, and that Orlando chose them based on neutral business reasons.

The Commission also adequately alleges that the omission was material. As Commissioner Uyeda himself observed, "the most important information to an investor in deciding whether to purchase securities in the SPAC's IPO is [] information about the SPAC's sponsor, such as . . . conflicts of interest." Uyeda Statement. A failure to disclose such a conflict here was arguably material, even if there were other exceptions in the clause that could have released Orlando from the payment for different reasons. See Def.'s Mot at 22. That is

especially so given the SEC's allegation that Orlando was released from the clause because he located Digital World as a merger partner for Trump Media.

C.  Scienter

Orlando next argues that the SEC has failed to allege that he acted with scienter as required by Section 10(b), Rule 10b-5, and Section 17(a)(1).  Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud."  Aaron v. SEC, 446 U.S. 680, 686 n.5 (1980) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).  Both "intentional wrongdoing and conduct undertaken with extreme recklessness" qualify.  SEC v. E-Smart Techs., Inc., 74 F. Supp. 3d 306, 321 (D.D.C. 2014) (citing Dolphin & Bradbury v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008)).  At the motion to dismiss stage, the SEC must plead facts that "taken collectively, give rise to a strong inference of scienter," meaning that the inference "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314–315 (2007).

The SEC has met that standard.  The Commission has alleged, for example, that Orlando negotiated with Trump Media on Digital World's behalf despite knowing that he could not discuss a merger prior to Digital World's IPO.  See e.g., Compl. ¶¶ 40, 72.  It further alleges that he regularly repeated his interest, on behalf of Digital World, in merging with Trump Media, see e.g., id. ¶¶ 63, 65–66, and was directly involved in the negotiations between the parties, see e.g., id. ¶¶ 74, 81.  The SEC also maintains that Orlando ensured Digital World's board of directors was composed of individuals who supported a potential merger with Trump Media.  Id. ¶ 49.  He then reviewed and signed filings indicating that Digital World had no targets and no contacts with any potential targets.  Taken together, these claims are sufficient to allege an intent to deceive, manipulate, or defraud.

Orlando makes two counterarguments, both of which are unavailing.  First, he argues that he lacked scienter because he acted in good faith reliance on advice of counsel who represented both SPAC A and Digital World in their respective registration statements.  See Def.'s Mot. at 23 (citing Howard v. SEC, 376 F.3d 1136, 1147 (D.C. Cir. 2004)).  To be sure, good faith reliance on counsel may defeat scienter.  But it is a factual defense.  See, e.g., Howard, 376 F.3d at 1148–49 (analyzing the factual record to determine whether the defendant relied in good faith on advice of counsel).  The mere fact that the same counsel prepared disclosures for both DWAC and SPAC A clearly is not enough to establish the defense at the pleading stage.  Orlando also argues that the SEC's evidence is "cherry picked."  Def.'s Mot. at 23.  Filling the perceived gaps, he points to his statements that "[t]here is no TMG SPAC" and that "there is absolutely no guarantee that we will close that deal or any other."  Id. (citing Compl. ¶¶ 56, 72).  But the complaint's theory that these pronouncements were fig leaves for Orlando's true intentions—as revealed by other statements and actions described in the complaint showing his work towards a Digital World-Trump Media combination—is "at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc., 551 U.S. at 315.

D.  Money and Property

Orlando next moves to dismiss the SEC's Section 17(a)(2) claim on the ground that the complaint fails to allege that he "obtained money or property through the use of the misstatements or omissions," RPM Int'l, 282 F. Supp. 3d. at 14, as required by the statute.  The misleading statements must have been, at least, a "necessary initial step" in obtaining money or property.  SEC v. Farmer, No. 14-cv-2345 (KPE), 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015).  And the money or property may be obtained directly or indirectly.  See SEC v. Cole, No. 12-cv-8167 (RJS), 2015 WL 5737275, at *6 (S.D.N.Y. Sept 19, 2015).

The SEC posits that Orlando's misleading statements facilitated Digital World's successful IPO and subsequent deal with Trump Media, which in turn yielded him a higher profit than if Trump Media had merged with SPAC A.  His take was greater, the Commission explains, because Digital World was better capitalized than SPAC A and Orlando owned a relatively larger percentage of shares in Digital World than he did in SPAC A.  Pl.'s Opp'n at 24 (citing Compl. ¶¶ 28, 64).

Orlando correctly observes the complaint is thin on details as to precisely how his alleged misstatements helped pull off, and thereby profit from, the switch from SPAC A to Digital World.  Def.'s Mot. at 24; Def.'s Reply 14.  But the Commission articulates at least a general connection, and the Court can construct a few plausible chains of causation.  Perhaps disclosure of Digital World's communications with Trump Media would have triggered further disclosure requirements that would have stymied or delayed the later transactions.  Or maybe letting the cat out of the bag would have alerted other potential Trump Media suitors, increasing competition for the deal.  Or, exposing Trump Media's identity as the target might have negatively affected Digital World's IPO (although that theory would appear at odds with the SEC's argument that the positive market reaction to the merger announcement demonstrates the materiality of Trump Media's identity to investors).

Allowing the SEC every reasonable inference at this early stage of the case, the Court declines to dismiss the Section 17(a)(2) claim.  However, the Court may well revisit the issue at summary judgment or trial.

E.  <u>Scheme Liability</u>

Orlando likewise moves to dismiss the SEC's allegations that Orlando "planned and executed a scheme to use [Digital World] . . . to pursue a merger with [Trump Media]."  Compl.

¶ 4.  So-called "scheme liability" under Section 17(a)(1) and (3), as well as Rules 10b-5(a) and (c), entails using "any device, scheme, or artifice to defraud" and "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. §§ 77q(a)(1), (3); 17 C.F.R. §§ 240.10b-5(a), (c).  To be subject to scheme liability, an individual must have "under[taken] a deceptive course of conduct that went beyond the misrepresentations."  Binance Holdings, 738 F. Supp. 3d at 76.[7]

The SEC cites several of Orlando's purported actions to support its allegation of scheme liability.  It notes that the Orlando signed a letter of intent on behalf SPAC A that prevented Trump Media from pursuing other SPACs while preserving Orlando's  ability to use Digital World to chase the merger.  See Pl.'s Opp'n at 25.  It alleges that Orlando sent pretextual letters of interest and NDAs to other potential acquisition candidates on Digital World's behalf following the IPO.  Id.  And it submits that Trump Media and SPAC A made no meaningful efforts to merge despite having signed a letter of intent to do so.  Id.  These allegations adequately support the SEC's contestation that Orlando undertook a deceptive course of action beyond his alleged misrepresentations.  See SEC v. Farnsworth, 692 F. Supp. 3d. 157, 189 (S.D.N.Y. 2023) ("Generally, scheme liability is triggered where the defendant performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.*, sham agreements [or] sham transactions . . . ." (cleaned up)).

---

[7] The D.C. Circuit has not had occasion to assess whether scheme liability requires more than the misrepresentations at issue.  But it appears that every other circuit to have considered the question has held that it does.  See SEC v. Rio Tinto plc, 41 F.4th 47, 49, 55 (2d Cir. 2022);  IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp., 660 F. App'x 850, 858 (11th Cir. 2016); Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012); WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011), abrogated on other grounds by Lorenzo v. SEC, 587 U.S. 71 (2019).

Orlando counters that the SEC's allegations are implausible because the completion of the Trump Media merger was not guaranteed and the purported scheme required other actors (namely, Trump Media) to act against their best interest. See Def.'s Mot. at 27–30. But the fact that the scheme could have failed, or that its success required actions from other parties, does not change the nature of Orlando's own alleged conduct. Cf. SEC v. DeFrancesco, 699 F. Supp. 3d. 228, 241–42 (S.D.N.Y. 2023) (acknowledging that the deceptive act requirement for scheme liability can be "met in a variety of ways" and explaining that "[a]t bottom, the SEC must only allege that [defendants] engaged in deceptive conduct that contributed to the larger scheme" (cleaned up)). The SEC has therefore plausibly alleged scheme liability.

F.  Disgorgement

Citing the Second Circuit's decision in SEC v. Govil, 86 F.4th 89 (2d Cir. 2023), Orlando next argues that disgorgement ought not be available as a remedy because the SEC has failed to plead investor harm. Govil held that disgorgement requires a showing of actual pecuniary loss by investors. Id. at 98, 103. As Orlando acknowledges, however, that is not the rule in this Circuit. See Def.'s Reply at 17. Here, pecuniary loss is a "useful measure of a violator's wrongdoing." Zacharias v. SEC, 569 F.3d 458, 471 (D.C. Cir. 2008).[8] But ultimately, "whether [Orlando's] securities violations injured others is irrelevant to the question whether disgorgement is appropriate" because the remedy exists to "deprive the wrongdoer of his ill-gotten gains." Id. (cleaned up). The SEC therefore was not required to plead pecuniary harm. The Court will

---

[8] Zacharias remains good law after the Supreme Court's decision in Liu v. SEC, which held that disgorgement remedies may not exceed a defendant's ill-gotten gains and must be "awarded for victims." 591 U.S. 71, 79–81 (2020). See SEC v. Crystal World Holdings, No. 19-cv-2490 (CJN), 2025 WL 326593, at *3 (D.D.C. Jan. 28, 2025) (observing that Govil might "have some force" in light of Liu, but explaining that "until the Court of Appeals reconsiders Zacharias, . . . [D.C. Circuit] law is that the amount of pecuniary harm to victims does not cap the amount of disgorgement that can be awarded against a wrongdoer").

accordingly leave any assessment of the SEC's entitlement to disgorgement until summary judgment or trial.

G.  Motion to Strike

Finally, Orlando moves to strike references in the complaint to the SEC's settlement with Digital World (see Compl. ¶ 104), claiming they "are immaterial, impertinent and prejudicial to Mr. Orlando."  Def.'s Reply at 18.  Striking is generally a disfavored remedy, however.  See Pilkin v. Sony Interact Entm't LLC, 20-7115, 2021 WL 2451299, at *1 (D.C. Cir. Mar. 19, 2021).  And while a settlement between an agency and another party is not a true adjudication of the underlying issue, see Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893–94 (2d Cir. 1976),  the Court agrees with the SEC that the complaint's discussion of the settlement offers context for the amendments to Digital World's subsequent Form S-4.  See Pl.'s Opp'n at 30. The Court therefore declines to strike references to the settlement.

**IV.  Conclusion**

For the foregoing reasons, it is **ORDERED** that

Defendant's [28] Renewed Motion to Dismiss the Complaint, or Alternatively Strike Portions of the Complaint, is **DENIED**.  It is further **ORDERED** that

Orlando shall answer the complaint by April 1, 2026.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 2, 2026